**SIERRA CLUB, Plaintiff, Appellee,**

v.

**SECRETARY OF the ARMY, et al., Defendants, Appellants.**

**SIERRA CLUB, Plaintiff, Appellant,**

v.

**SECRETARY OF the ARMY, et al., Defendants, Appellees.**

**SIERRA CLUB, Plaintiff, Appellant,**

v.

**SECRETARY OF TRANSPORTATION, et al., Defendants, Appellees.**

Nos. 86–1940, 86–1950 and 86–1951.

United States Court of Appeals, First Circuit.

Argued April 7, 1987.

Decided June 3, 1987.

ding, Boston, Mass., were on brief, for Sierra Club.

Before COFFIN, BOWNES and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Sundry officials of the federal government are appellants (and cross-appellees) herein.[1] Each is sued in his or her representative capacity. They challenge two judgments entered in the United States District Court for the District of Maine which provide that the government is liable to the plaintiff-appellee, the Sierra Club (a not-for-profit public interest group dedicated to protection of the environment), for attorneys' fees and costs under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412.

Their appeal is trichotomous: they contend that the district court failed to conduct the requisite independent analysis as to whether fee-shifting was called for under the EAJA; that in any event—independent analysis or no—the court miscalculated in determining that substantial justification was wanting for the government's course of conduct; and that, even if an EAJA liability vested, it was error to adjust the award by reference to the cost of living.

In its appeals—there are two, *see post* —the Sierra Club asserts that the attorneys' fees authorized by the district court were too skimpy. The fees should be increased beyond the inflation-adjusted time-and-rate formulation, this thesis runs, because of the largely contingent nature of the compensation arrangement between the Club and its lawyers.

We affirm the judgments of the district court in all respects.

## I. BACKGROUND

There were two separate—but related— cases brought in the district court, and

Kathleen P. Dewey with whom F. Henry Habicht II, Asst. Atty. Gen., Washington, D.C., Richard S. Cohen, U.S. Atty., F. Mark Terison, Asst. U.S. Atty., Portland, Me., and Jacques B. Gelin, Washington, D.C., were on brief, for Secretary of the Army and Secretary of Transp.

Edward F. Lawson with whom Peter L. Koff and Weston, Patrick, Willard & Red-

1. The federal appellants include: John O. Marsh, Secretary of the Army; Carl B. Sciple, Division Engineer, United States Army Corps of Engineers; Elizabeth H. Dole, Secretary of the Department of Transportation; and William D. Richardson, Division Administrator, Federal Highway Administration. These proceedings present no need to differentiate among the various federal parties; hence, they will be referred to collectively as "the government" or simply as the "appellants."

hence, two separate judgments entered which pertain to fees. Both cases dealt with the Sierra Club's efforts to block aspects of the suggested development of a marine terminal, cargo port, and, possibly, an industrial park, at Sears Island, Maine. The first suit entailed a disagreement about whether the project would "significantly affect[ ] the . . . environment." 42 U.S.C. § 4332(2)(C). Various federal agencies concluded that it would not, and allowed the development to go forward without the preparation of an Environmental Impact Statement (EIS). The district court found in favor of the government on all five counts of the plaintiff's complaint, agreeing that an EIS was not required. We reversed; we held that, under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, an EIS was needed. *Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir.1985) (*Sierra I*). Inasmuch as we viewed the plaintiff's NEPA argument as dispositive, we had no occasion to reach the question of whether the other federal laws and regulations enumerated in the complaint had been abridged.

In the second suit, the district court held that yet another federal agency, the Coast Guard (an arm of the federal Department of Transportation), had violated the General Bridge Act of 1946, 33 U.S.C. § 525(b), by issuing a permit for the construction (as part of the same project) of a proposed causeway from Kidder Point to Sears Island. The district court revoked the permit. Although the federal defendants acquiesced at this juncture, the state of Maine unsuccessfully appealed the revocation order. *See Sierra Club v. Secretary of Transportation*, 779 F.2d 776 (1st Cir. 1985) (*Sierra II*).

We will not address the details of these prior proceedings beyond the extent necessary to put the matters before us into due perspective. The opinions in *Sierra I* and *Sierra II* are comprehensive, and the reader with a penchant for exegetic detail is best referred to them. It suffices for the moment to note that the Sierra Club, having gotten the basic relief which it set out to garner, then applied for, and was awarded, attorneys' fees and expenses under the EAJA. *Sierra Club v. Marsh*, 639 F.Supp. 1216 (D.Me.1986) (*Sierra III*). These appeals followed.[2]

The government acknowledged in the district court that the Sierra Club was a "prevailing" litigant within the meaning of 28 U.S.C. § 2412(d)(1)(A) as to both suits. *Sierra III*, 639 F.Supp. at 1217–18. It likewise conceded that the plaintiff was a "party" eligible to advance an EAJA claim. *Id.* at 1218. It has not asserted that "special circumstances" exist which should foreclose a fee award in this instance. Its appeal, therefore, boils down to whether the Sierra Club deserved fees for *Sierra I* under appropriate EAJA criteria,[3] and if so, how the amount should have been computed. We turn directly to the questions so presented.

## II. THE INDEPENDENT ANALYSIS REQUIREMENT

■■■ While the EAJA is designed to "encourage relatively impecunious private parties to challenge abusive or unreasonable governmental behavior by relieving such parties of the fear of incurring large litigation expenses," *United States v. 1,378.65 Acres of Land*, 794 F.2d 1313,

---

**2.** The district court's opinion in *Sierra III* encompassed the EAJA arguments pertaining to both of the earlier cases. The federal appellants have prosecuted an appeal from the award in *Sierra I*, but press no objection to the award in *Sierra II*. The Club's twin appeals challenge the paltriness of both awards. Although the plaintiff's *Sierra II* initiative is the only pending appeal in respect to that case, we will nevertheless use the term "cross-appeals" to refer to the Club's collective appellate undertakings, and will sometimes refer to the Club itself as "the appellee."

**3.** The EAJA, 28 U.S.C. § 2412(d)(1)(A), provides in relevant part that:

> A court shall award to a prevailing party other than the United States fees and other expenses, . . . incurred by that party in any civil action . . . including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, . . . unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

1315–16 (8th Cir.1986) (citing *Spencer v. NLRB,* 712 F.2d 539, 549 (D.C.Cir.1983), *cert. denied,* 466 U.S. 936, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984)), it does not allow the automatic shifting of fees. If the government can demonstrate that its position was substantially justified or that unusual circumstances existed which would make an award unjust, then the fee tree does not flower, notwithstanding that the applicant is a prevailing party within the meaning of the statute. In surveying this terrain, the court must examine both the position of the federal sovereign in the underlying litigation and the governmental conduct which led to that litigation. *See* 28 U.S.C. § 2412(d)(2)(D) (1985). Despite earlier uncertainty, it is by now well settled that the "position" which must be justified comprises "both the position of the agency and the litigation position of the government." *United States v. Yoffe,* 775 F.2d 447, 449 (1st Cir.1985).

■ The government has the burden of proving substantial justification by a preponderance of the evidence. *Id.* at 450. In order to carry the devoir of persuasion, the government must show that it had a reasonable basis for the facts alleged, that it had a reasonable basis in law for the theories it advanced, and that the former supported the latter. *Id.* That the government lost in the underlying litigation does not create a presumption that its position was not substantially justified. But, there is a flip side to the coin: the sovereign is not exempted from liability under the EAJA merely because it prevailed at some interim point in the judicial process. *Id.* *See also Martin v. Heckler,* 754 F.2d 1262, 1264 (5th Cir.1985).

■ Viewed through such a glass, it becomes readily apparent that the test of reasonableness in the precincts patrolled by the EAJA is different from that applied for purposes of determining whether agency action or inaction is "reasonable" or "unreasonable," *i.e.,* arbitrary and capricious,

under, say, the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* As Emerson said of nature, reasonableness "is a mutable cloud, which is always and never the same." R.W. Emerson, *Essays: First Series* (1841). Congress was painstaking in creating a distinct legal standard "substantially justified"—for EAJA use, rather than merely echoing the familiar "arbitrary and capricious" refrain.[4] We have equated that standard with a test of reasonableness, *United States v. Yoffe,* 775 F.2d at 450—but it remains, nonetheless, a test tailored to the dictates of the EAJA.

To be sure, these disparate ways of assessing reasonableness will, at times, overlap—indeed, a factfinder must take into account essentially the same underlying facts and legal arguments in discerning what is "reasonable" for either purpose. Nevertheless, because of the definitional differences, the district court must carefully refrain from treating every reversal of agency action as the functional equivalent of an "unreasonable" position in the EAJA sense. *Cf. Riddle v. Secretary of Health and Human Services,* 817 F.2d 1238 (6th Cir.1987) (LEXIS, Genfed library, U.S.App. file); *Federal Election Comm'n v. Rose,* 806 F.2d at 1089–90. An exercise of independent judgment is essential to determine whether an EAJA award is warranted; the answer is not "wedded to the underlying judgment on the merits." *Id.* at 1087. Though both roads may in a given instance lead to Rome, that will not always be the case. At times, they will lead to different destinations. Any other approach would demean the precise language of the Act. As the Federal Circuit has said: "Making the outcome of the case determinative would virtually eliminate the 'substantially justified' standard from the statute." *Broad Avenue Laundry & Tailoring v. United States,* 693 F.2d 1387, 1391 (Fed. Cir.1982). *Accord Washington v. Heckler,* 756 F.2d 959, 961 (3d Cir.1985). We defer to Congress's judgment that a separate yardstick should be employed to measure

---

**4.** As the District of Columbia Circuit has noted, "the 'arbitrary and capricious' label is just that, a label or conclusion applied to a rich variety of agency conduct, including sensible but legally flawed actions as well as outrageous ones." *Federal Election Comm'n v. Rose,* 806 F.2d 1081, 1089 (D.C.Cir.1986).

the propriety of fee-shifting as against the federal sovereign. Thus, after the merits of a case have been adjudicated, fresh and distinctive inquiry is needed to determine whether a fee entitlement vests under EAJA.

## III. THE INQUIRY BELOW

The government contends that, in this case, the district court did violence to these tenets. In essence, the appellants claim that the court did not conduct its own analysis of whether the government's position was substantially justified, but instead, relied upon our decision on the merits in *Sierra I* to an impermissible extent. In the appellants' view, the district judge reflexively treated our holding that bypassing the preparation of an EIS was arbitrary and capricious as eliminating the necessity for any independent inquiry into whether or not there was adequate reason undergirding the federal posture. We disagree, for we do not read *Sierra III* in such a wooden way.

The key to the tangram is, of course, to be found in *Sierra III* itself. Although the district court did not explicitly state that its finding of "no substantial justification" was arrived at in consequence of an independent inquiry, the court's opinion, taken in context, shows that such was the case. We remark, first, that the district court properly restated the applicable standard of reasonableness, illuminating its awareness of the test to be applied. *Sierra III*, 639 F.Supp. at 1218 & n. 3. The court specifically recognized that "[t]he test of reasonableness 'represents a middle ground between an automatic award of fees to a prevailing party and an award made only when the government's position was frivolous'." *Id.* at 1218 (quoting *United States v. Yoffe*, 775 F.2d at 450). Plainly, the district court was conscious that the outcome of the case was not *per se* determinative of the appellee's EAJA quest.

The district court then proceeded, as we read *Sierra III*, to make its separate inquiry into the reasonableness of the government's stance. It observed that "[t]he opinion of the Court of Appeals in this case precludes a finding by this Court that the government's position, either in the litigation or in the agency actions which gave rise to the litigation, was substantially justified." *Id.* at 1218. The appellants see this reference as a telltale indication that the judge robotistically "equated the government loss on the merits with a lack of substantial justification." Appellants' Brief at 13. This, we think, is an overly myopic reading of the script. While it is true that the district court considered *Sierra I* in determining the reasonableness of the government's position, *i.e.*, the presence or absence of substantial justification, such consideration was by no means inconsistent with the duty of independent inquiry. After all, an analysis of the degree to which agency actions were or were not warranted cannot sensibly be made in a vacuum; prior proceedings in connection with the case must be taken into account. *E.g., Ellis v. United States*, 711 F.2d 1571, 1576–77 (Fed.Cir.1983). It would have been foolhardy—and wrong—for the district court, in calibrating the scales of substantial justification, to have pretended that our opinion in *Sierra I* did not exist, or to have ignored it.

In essence, the government would have us strain at a gnat, yet swallow a camel. We find such a bill of fare unappetizing. We prefer to follow the dictates of elementary logic and take the district court's observation in its most natural sense. Thus, we deem the court below to have meant that our decision in *Sierra I* "preclude[d]" a finding of substantial justification not because it was *our* decision, not because the government lost, not because the agency action (the election to eschew an EIS) was held to be arbitrary—but because the areas of weakness and inconsistency which *Sierra I* laid bare undermined the government's claim that waiver of an EIS had been substantially justified. Certainly, *Sierra I* brought to the forefront a variety of matters which cut against any finding that the federal stance was reasonable or justifiable. *E.g.,* 769 F.2d at 874–75, 877–80. After the district court made its independent inquiry and discovered this array of points, it could scarcely be criticized for

concluding that *facts* such as these "preclude[d]" holding the federal sovereign's refusal to go the EIS route to have been reasonable.

■ The government argues that its victory in the district court should be weighed in the EAJA balance as "overwhelming evidence" that its position was defensible. That asseveration places the thumb of a temporary triumph too heavily on the fee-shifting scale. We readily acknowledge that when the United States wins several rounds but ultimately loses on points, its early success is some evidence of justification which the court should factor into the EAJA analysis. *See Porter v. Heckler,* 780 F.2d 920, 922 (11th Cir.1986) ("district court victory may be evidence that the government's position was justified"); *Sigmon Fuel Co. v. Tennessee Valley Authority,* 754 F.2d 162, 167 (6th Cir.1985) (success below is evidence that the government's position was not frivolous); *Cinciarelli v. Reagan,* 729 F.2d 801, 806 (D.C.Cir.1984) (similar). But, that is a far cry from saying that, once the government has prevailed below, its position *must* be deemed to have been substantially justified irrespective of what eventuates on reconsideration or on appeal. To suggest that early foot *ipso facto* carries the "substantial justification" day, notwithstanding that the case proves dreadfully deficient in the long haul, would be paralogical. *Yoffe,* 775 F.2d at 450, holds explicitly to the contrary. Indeed, such a rule would undercut the settled precept—to which the appellants pay lip service when convenient—that the EAJA calls for a separate analysis of "reasonableness," independent of conventional merits adjudication.

■ To the extent that the defendants' district court victory deserved consideration, there is no reason to doubt that it was considered. The EAJA determination was made by the same district judge who had presided at the trial. It taxes credulity to ask us to believe that he overlooked his own earlier decision in analyzing the legitimacy of the government's position. *Cf. Whyte v. Connecticut Mutual Life Insurance Co.,* 818 F.2d 1005, 1013 (1st Cir. 1987). It seems much more plausible to conclude, as we do, that he weighed the significance of the appellants' fleeting victory in the balance, and found it wanting. When due regard is accorded to the allocation of the burden of proof and the particular circumstances of this case, such a conclusion seems eminently sound.[5]

## IV. SUBSTANTIAL JUSTIFICATION

■ We reject the contention that the district court stumbled in its holding that no substantial justification was proved. We must accept the court's findings of fact unless clearly erroneous, and must subject its conclusions of law to plenary review. *Yoffe,* 775 F.2d at 451. "Where ... the facts are not in dispute, the district court's holding [as to substantial justification] should be reviewed *de novo* because it is a legal conclusion." *Id.* That is, of course, the situation here. And, following the *Yoffe* modality, we find no fault with the district court's determination that the government fell short of establishing that its position was sufficiently warranted.

There was generous reason to distill a lack of substantial justification from the record in this case. In *Sierra I,* for example, this court pinpointed a host of facts strongly indicating that the federal appellants were unreasonable in insisting that the project did not necessitate preparation of an EIS. We cite but a few. Prior to the government turning thumbs down on an EIS, "[s]everal Federal agencies including, EPA, U.S. Fish & Wildlife, and the National Marine Fisheries [felt] that the project requires an EIS...." *Sierra I,* 769 F.2d at

**5.** While our review of *Sierra III* and of the facts and legal principles underpinning it leads us to conclude that the district judge engaged in the requisite independent analysis, we acknowledge that it is not perfectly clear that he did so. Yet, any error in this regard would assuredly be harmless. The parties have asked us, if we find that an independent analysis was not conducted below, to pass directly on the issue of substantial justification, rather than to remand. And in our view, separate and apart from the way in which we read *Sierra III,* the government has failed to prove that its position in this matter was a reasonable one. *See* Part IV *post.*

874–75. The Federal Highway Administration (FHwA) warned, early on, that "[f]rom a purely legal perspective, an EIS may be required per the [Council on Environmental Quality] regulations. . . ." *Id.* at 875. Defendant Richardson was "well aware" of these CEQ requirements. *Id.* The Army Corps of Engineers and the FHwA utterly ignored the "indirect effects" (sometimes called "secondary impacts") of the proposed development, despite clear law to the contrary. *Id.* at 877–80.

In the face of such palpable indicia that the government's stance was shaky from the start, the appellants abjured the presentation of any evidence during the EAJA phase of the litigation. They chose not to attempt to amplify the argument that their position turned on some close or unsettled question of law. *E.g., Washington v. Heckler,* 756 F.2d at 961–62; *Spencer v. NLRB,* 712 F.2d at 559–61. Instead, they erected a papier-mache rampart comprised solely of their evanescent district court victory. Such total reliance was totally misplaced. Though success at a preliminary stage in the proceedings may be some evidence of justification, *see ante,* it does not, by itself, catapult the government over the hurdle. "The government's burden of showing substantial justification is a strong one and is not met merely because the government adduces 'some evidence' in support of its position." *Washington v. Heckler,* 756 F.2d at 961. In this case, the unadorned fact of the government's transient success in the district court was manifestly insufficient to overcome the weight of the evidence and the suasive force of the applicable law. We need not dwell upon whether, as seems to be the case, the appellants' position was unreasonable to the point of being unjustified. What is dispositive is that the contrary remains completely unproven.

The fact that in *Sierra I* we had no occasion to reach the question of whether the conduct of the federal agencies violated laws or regulations other than NEPA, does not assist the government in this proceeding. The appellants asserted that no EIS was legally required. The Sierra Club took the opposite position. To be sure, there were several arrows in the Club's quiver, that is, several theories upon which the appellee grounded the presumed need for an EIS. If a single arrow hit the mark, however, its impact was sufficient to mandate preparation of an EIS and to bottom an injunction pending formulation of one. Thus, so long as the government was unable to establish that its resistance to the NEPA arrow was substantially justified— and the district court (supportably, in our view) so found—then the appellee, having prevailed, was entitled to the benefits of fee-shifting under the EAJA.[6]

## V. THE COST OF LIVING INCREASE

Having determined that the appellee was deserving of an EAJA garland, we turn next to the prong of the primary appeal which questions the computation of the fee award. In order to understand the government's lamentation that the district court improperly adjusted counsel's hourly rate to account for the increased cost of living since 1981, it is useful to scan the history of the statute.

The EAJA was initially conceived as an experiment in using fee-shifting as a means of ensuring administrative accountability and concomitantly, of lessening the financial burden on those who victoriously pursued that accountability through litigation. As first enacted, the EAJA had a lifespan of only three years—from October 1, 1981 to October 1, 1984. The experiment proved sufficiently beneficial to merit retention— but renewal proved to be no simple matter.

**6.** These appeals do not present the question of whether a party may receive fees under the EAJA for services rendered with respect to issues upon which it did not prevail. *Cf. Hensley v. Eckerhart,* 461 U.S. 424, 434–37 & nn. 10–11, 103 S.Ct. 1933, 1939–41 & nn. 10–11, 76 L.Ed.2d 40 (1983) (discussing fee-shifting under 42 U.S.C. § 1988). The appellee prudently limited its fees application anent *Sierra I* to work done exclusively on the NEPA aspect. *See Sierra III,* 639 F.Supp. at 1218 n. 2. We therefore leave for another day the extent to which § 1988 jurisprudence vis-a-vis mixed bags of claims—some successful, some not—may have relevance in the EAJA context.

It was only after a number of clarifying amendments were devised that the EAJA was salvaged by the Congress on August 5, 1985. *See* Pub.L. No. 99–80, § 6, 99 Stat. 183 (1985). Its provisions were given retroactive effect to ameliorate the effects of the temporary hiatus which existed from October 1984 to August 1985. *See id.* at 186.

The original EAJA contained a provision limiting attorneys' fees to $75 per hour "unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A)(ii) (1980). This language remained unchanged in the 1985 reenactment.[7] Pursuant thereto, the Sierra Club urged that a higher hourly rate be applied to its fees application, citing an increase in the consumer price index between September 1981 and September 1985. The district court acceded to this request, and the award reflected such an increment. *Sierra III*, 639 F.Supp. at 1221–22. The government argues that the district court erred in granting fees in excess of $75 per hour on the basis of this calculation.[8] It concedes, however, that the cost of living rose between 1981 and 1985, and that the incremental portion of the award properly reflected the extent of the hike. Accordingly, the challenge reduces to a pure question of statutory construction: once we resolve whether the district court was empowered to consider inflation during this interval (1981–1985), we need go no further.

As we have noted, the 1985 EAJA amendments did not change either the $75 hourly cap on attorneys' fees or the language which ceded judicial discretion to augment that rate due to inflation. The government contends that since the ceiling was not modified, Congress must have intended that all increases in the cost of living prior to reenactment in August 1985 were subsumed therein and to be ignored in future fee-setting. While some courts have agreed with this tightfisted interpretation, *see, e.g., Chipman v. Secretary of Health and Human Services*, 781 F.2d at 547; *Dubreuil v. Secretary of Health and Human Services*, No. 84–2262 Mc, slip op. at 4 (D.Mass. February 20, 1987) [Available on WESTLAW, DCT database]; *Trahan v. Regan*, 625 F.Supp. 1163, 1168 (D.D.C.1985), we decline to join them. To be sure, "section 2412 is a limited waiver of sovereign immunity [and as such] it is to be narrowly construed and strictly observed." *Lane v. United States*, 727 F.2d 18, 20–21 (1st Cir.), *cert. denied*, 469 U.S. 829, 105 S.Ct. 113, 83 L.Ed.2d 57 (1984). Nevertheless, after giving due weight to this precept, we find that settled rules of statutory construction and the purpose and underlying public policy of the statute conduce to a more expansive reading of the EAJA than the government ad-

---

7. The EAJA originally contained a sunset provision automatically shelving the law on October 1, 1984. When the Act was revivified in 1985, the expiration provision was repealed retroactively. The exact nature of what was done does not lend itself to easy labelling; one can view the EAJA as having been "reenacted," or "extended," or "amended." In the cost of living context, for example, the District of Columbia Circuit indicated that the Act was extended by "a series of amendments," rather than reenacted. *Hirschey v. FERC*, 777 F.2d 1, 5 n. 22 (D.C. Cir.1985). Some tribunals have spoken of "reinstate[ment of] the original legislation." *Trichillo v. Secretary of Health and Human Services*, 647 F.Supp. 125, 127 (N.D.N.Y.1986). Other courts seemingly viewed the 1985 legislation as comprising a reenactment. *See, e.g., Chipman v. Secretary of Health and Human Services*, 781 F.2d 545, 547 (6th Cir.1986); *Jackson v. Heckler*, 629 F.Supp. 398, 405 (S.D.N.Y. 1986). For the purposes at hand, however, appellations have no particular import: what principally interests us is that the cost of living provision was carried—unchanged—from the original act into the 1985 version. Thus, we employ terms like "reenactment" or "renewal" for the sake of convenience only, without attaching talismanic significance to any precise choice of phrase.

8. The district court used the same inflation-adjusted hourly rate in calculating the fee award referable to *Sierra II. See Sierra III*, 639 F.Supp. at 1224–25. Yet, the government—which vigorously protests the lawfulness of the enhanced rate in respect to *Sierra I*—has not pressed any appeal to the use of precisely the same rate under entirely comparable circumstances in the companion case. This strange twist once again proves that "irony is no stranger to the law." *Amanullah v. Nelson*, 811 F.2d 1, 18 (1st Cir. 1987).

mits. And, we believe that the better-reasoned caselaw accords with our view.

Prior to its renewal, the EAJA's inflation escalator was generally interpreted as allowing upward adjustment in hourly rates based on the cumulative increases in the cost of living which had transpired from 1981 onward. *E.g., Continental Webb Press, Inc. v. NLRB,* 767 F.2d 321, 323–24 (7th Cir.1985); *Action on Smoking and Health v. CAB,* 724 F.2d 211, 218 (D.C.Cir. 1984); *Natural Resources Defense Council, Inc. v. EPA,* 703 F.2d 700, 713 (3d Cir.1983). There is nothing in either the 1985 EAJA amendments or in the legislative history underlying them to indicate that Congress intended—or even contemplated in passing—courts thenceforth to ignore inflation which had occurred between 1981 and 1985. In light of the past (uncontested) interpretation favoring the allowance of cumulative increases, the normal expectation would be that, if Congress desired to change the rules, it would do so explicitly. *See Bush v. Oceans International,* 621 F.2d 207, 211 n. 4 (5th Cir.1980); *cf. Devine v. White,* 697 F.2d 421, 431 n. 42 (D.C.Cir.1983). Given the historical record, congressional silence is strong evidence of a legislative policy that, after reenactment, the escalator continued to operate exactly as before.

■ The appellants ask us, in effect, to conclude that the statute was amended by implication. Yet, amendments by implication are disfavored. *See United States v. Welden,* 377 U.S. 95, 103 n. 12, 84 S.Ct. 1082, 1087 n. 12, 12 L.Ed.2d 152 (1964). As the district court recognized, the gist of the applicable canon of statutory construction is that:

> [p]rovisions of the original act or section which are repeated in the body of the amendment, either in the same or equivalent words, are considered a continuation of the original law ...
>
> ... Words and provisions used in the original act or section are presumed to be used in the same sense in the amendment. Moreover, the legislature is presumed to know the prior construction of the original act, and if words or provi-

sions in the act or section amended that had been previously construed are repeated in the amendment, it is held that the legislature adopted the prior construction of the word or provision.

*Sierra III,* 639 F.Supp. at 1221–22 (quoting IA C. Sands, *Sutherland on Statutory Construction,* § 22.33 (4th ed. 1985)). Customarily, Congress is thought to be aware of an existing statutory construction. Absent some evidence of an attempt to change that construction, a substantial reenactment of the law incorporating its preexisting phraseology is usually the functional equivalent of codifying the earlier construction into the statute. *Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 869, 55 L.Ed.2d 40 (1978); *Saxbe v. Bustos,* 419 U.S. 65, 74, 95 S.Ct. 272, 278, 42 L.Ed.2d 231 (1974); *Commissioner of Internal Revenue v. Estate of Noel,* 380 U.S. 678, 682, 85 S.Ct. 1238, 1240, 14 L.Ed.2d 159 (1965).

■ In this instance, the appellants have not shown the faintest reason for a departure from this salutary tenet. If Congress had intended to limit the EAJA's cost of living provision in the dramatic way urged by the government, we believe that it would have done so plainly and in no uncertain terms. Inasmuch as this did not occur, the resultant gulf is simply too wide to be bridged by inferring such a limitation out of thin air. The very fact that the $75 per hour cap on attorneys' fees was not altered is, as we assess it, a powerful indication that Congress intended the courts to continue to exercise discretion to account for pre–1985, as well as post–1985, inflation.

■ Another principle, too, comes into play. Unless the language of a statute itself points in a contrary direction, courts are bound to interpret it consistent with the legislative intent, if discernible. *Philbrook v. Glodgett,* 421 U.S. 707, 713–14, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975); *United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). An interpretation such as the appellants presently urge would work to defeat the EAJA's manifest

purpose. Congress hoped that the knowledge that federal agencies would have to pay "sizable awards of attorneys' fees when they overstepped their authority and were challenged in court would induce administrators to behave more responsibly in the future." *Spencer v. NLRB,* 712 F.2d at 550. The cost of living provision was a part of this armamentarium; it was "designed to provide a disincentive to agencies to prolong the litigation process." *Natural Resources Defense Council v. EPA,* 703 F.2d at 713. Shortstopping the escalator serves a precisely antipodal end. If the escalator were rigged to bypass several floors, its usefulness as a deterrent device would be considerably curtailed.

There is a final feather in the appellee's argument for relaxation of the cap. The alternative interpretation hawked by the government—that Congress wanted to use historical inflation effectively to shrink the maximum hourly rate from its original 1981 level—would mean that inflation-adjusted fees awarded prior to August 1985 for services rendered in the 1981–85 time frame, would be higher than comparable fees for the same time frame awarded after reenactment of the EAJA. That is to say, if twin lawyers, handling parallel cases, did exactly the same work at exactly the same time with exactly the same results, the one whose EAJA application was heard and decided under the original EAJA could receive the enhanced rate (commensurate with increases in the cost of living from 1981 forward), but the one whose application was processed under the reenactment would be paid at a lesser rate. As can readily be seen, such a paradoxical interpretation would make very little sense. Since we honor the rule that a statute should be construed so as to avoid unjust or absurd results, *see Ciampa v. Secretary of Health and Human Services,* 687 F.2d 518, 524 (1st Cir.1982); *Massachusetts Financial Services, Inc. v. Securities Investor Protection,* 545 F.2d 754, 756 (1st Cir. 1976), *cert. denied,* 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977), we correspondingly discount the appellants' reading of the law.

Mindful of the legislative goals which undergird the EAJA and the lack of any indication that Congress intended to change the role of the cost of living provision in furthering those goals, we conclude that the 1985 reenactment did not curb judicial authority to adjust EAJA fees for inflation in the same manner and to the same extent as under the original version of the Act. The federal courts remain able to augment hourly rates by considering changes in the cost of living which took place between October 1981 and August 1985, and thereafter. *Accord Hirschey v. FERC,* 777 F.2d 1, 5 (D.C. Cir.1985); *Ruiz v. Bowen,* No. 84 C 7395, slip op. (E.D. Ill. Feb. 20, 1987) [Available on WESTLAW, DCT database] (LEXIS, Genfed library, Dist. file); *Jackson v. Heckler,* 629 F.Supp. at 405; *Trichillo v. Secretary of Health and Human Services,* 647 F.Supp. at 127; *Mayberg v. Heckler,* No. 82–2982K, slip op. at 16 (D.Mass. Dec. 20, 1985). In our judgment, the district court acted within the lawful scope of its discretion when it granted the Sierra Club an increase in the statutory hourly rate based on climbing prices from and after 1981.

## VI. THE CROSS–APPEALS

The cross-appeals implicate the appellee's solicitation of a further 25% jump in the hourly rate to account for the contingent nature of the fee agreement with its attorneys. It seeks such a multiplier with respect to the underlying awards in both *Sierra I* and *Sierra II.* The request was made to the district court but a deviation of this sort was found "not [to] be proper in this case." *Sierra III,* 639 F.Supp. at 1222.

Relying principally on precedent which has evolved under the Civil Rights Fees Act, 42 U.S.C. § 1988, the Club argues that a premium should be fashioned to compensate its counsel for the risk that, had the plaintiff lost (or prevailed, but in circumstances where the federal appellants' actions were deemed to have been "substantially justified"), the lawyers would have gone begging—and perhaps, have incurred substantial out-of-pocket expenses to boot. Where § 1988 controls, we have held that

"a court may within reasonable limits adjust the hourly rate to 'compensate for the risk that the lawsuit would be unsuccessful and that no fee at all would be obtained.'" *Maceira v. Pagan,* 698 F.2d 38, 41 (1st Cir.1983) (quoting *Copeland v. Marshall,* 641 F.2d 880, 892 (D.C. Cir.1980)). *See also Wildman v. Lerner Stores Corp.,* 771 F.2d 605, 612–14 (1st Cir.1985) (multiplier for contingency permissible under Fees Act).[9] The Sierra Club would have us extend this principle to the EAJA, and to hold that the district court's failure to energize the multiplier mechanism in these cases was tantamount to an abuse of its discretion. The imprecation asks too much.

It is a relatively open question whether the EAJA—as opposed to the Fees Act—permits a multiplier to be employed as an added compensation for contingency arrangements. We note at the outset that the EAJA differs from other fee-shifting statutes (such as the Fees Act) in material respects. While § 1988, for example, entitles a prevailing party to "reasonable" attorneys' fees, the EAJA caps hourly rates and allows courts—other than adjusting for inflation, *see ante* Part V—to lift the cap only in narrowly constrained circumstances. Courts have discretion to consider whether "a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A). Apart from this single reference to a shortage of qualified counsel, the EAJA is silent as to how elastic (or inelastic) the "special factor" language may be.

In this case, the Sierra Club contends that the contingent nature under which its

counsel were engaged constituted just such a "special factor." There is a divergence of opinion as to whether contingency is a "special factor" of the type which may be considered under the EAJA. *Compare Action on Smoking and Health v. CAB,* 724 F.2d at 218 (adjustment to EAJA rates for contingent nature of engagement appropriate) *with Underwood v. Pierce,* 761 F.2d 1342, 1347–48 (9th Cir.1985) (no multiplier, for contingency or otherwise, may be applied to fees awarded under EAJA). *See also Bunn v. Bowen,* 637 F. Supp. 464, 473–74 (E.D.N.C.1986) (contingency multiplier inapposite under EAJA). A kindred issue was left undecided by the Court in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* — U.S. —, 106 S.Ct. 3088, 3100, 92 L.Ed.2d 439 (1986), and remains under review. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* — U.S. —, 106 S.Ct. 3331, 92 L.Ed.2d 737 (1986).[10]

■ Though the background and theoretical underpinnings of the problem are intriguing, the case at bar does not legitimately call upon us to pursue the question further. There is no case which holds that—contingency or no—a party is entitled to an EAJA "special factor" premium *as a matter of right.* Assuming for the sake of argument—but without deciding—that it would be permissible for a court to raise EAJA's permitted hourly rates because of the aleatory nature of a lawyer's fee arrangement, the most that can be said for the plaintiff's position is that the district court had discretion to grant such an upward adjustment. Yet, the district court in this instance decided not to do so. It

---

**9.** Even as to the Fees Act, the circuits are split on the propriety of a multiplicative lodestar adjustment to account for contingency. *Compare, e.g., Wildman, supra,* and *Hall v. Borough of Roselle,* 747 F.2d 838, 842–43 (3d Cir.1984) (multiplier allowable) *with McKinnon v. City of Berwyn,* 750 F.2d 1383, 1391–93 (7th Cir.1984), and *Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4, 26–28 (D.C.Cir.1984), *cert. denied,* 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985) (questioning whether multiplier ever appropriate on the basis of contingency).

**10.** On July 7, 1986, the Court set *Delaware Valley* for reargument on the question of "whether

a presumptively reasonable attorneys' fee award under Section 304(d) of the Clean Air Act, 42 U.S.C. § 7604(d), may be 'multiplied' or otherwise enhanced to reflect the risk that plaintiffs might not have prevailed and, therefore, might have obtained from defendants no attorneys' fees at all." 106 S.Ct. at 3331. The case was argued on October 15, 1986 and is presently under advisement. Although the ossature of the EAJA is somewhat different from that of § 7604(d)—which more resembles the Fees Act in its makeup—the Court's forthcoming opinion promises to be of obvious guidance in the EAJA context as well.

examined the nature of the actual fee arrangement, determined that the arrangement was based in part on the understanding that there would be some fundraising efforts undertaken to pay for legal services, and concluded that neither an enhanced fee award nor a "special factor" adjustment was proper in this case. *Sierra III*, 639 F.Supp. at 1222. Whatever label the district court attached to the fee agreement, it had knowledge of all of the facts pertinent to counsels' retention and to the circumstances of the litigation. It is too much of a stretch to say that the court's determination not to raise further the already "inflation-adjusted hourly rate ... to reflect the allegedly contingent nature of [counsels'] fee arrangement," *id.* at 1222, was an abuse of discretion.

## VII. CONCLUSION

In summary, we find that the district court applied the correct analytic modality in considering the Club's EAJA petitions. It made an independent inquiry and concluded that the government failed to sustain the burden of proving its position to have been substantially justified. That conclusion was supportable. Even if the district court's opinion can be read as collapsing the two separate questions of merits adjudication and substantial justification into one, and its approach thereby faulted, our freestanding examination of the record conduces to exactly the same result. On any view, therefore, the plaintiff was entitled to reasonable fees and costs within the purview of the EAJA.

Inasmuch as Congress has not foreclosed the operation of a cost of living escalator for periods prior to August 5, 1985, we further find that no error was committed in using such a device to calculate the amount of the fees awarded to the prevailing plaintiff in regard to *Sierra I.* (The government, of course, failed to preserve its rights to complain about the enhancement of fees appertaining to *Sierra II, see ante* n. 8.) Finally, we discern no abuse of the district court's discretion in declining to grant a premium to the Sierra Club's attorneys referable to the quasi-contingent nature of their engagement.

For the reasons which we have elucidated, these various appeals and cross-appeals are each and all unavailing. The judgments of the district court are, therefore,

*Affirmed.* No fees or costs to be awarded under EAJA or otherwise in consequence of these appellate proceedings.