Jose RAMON–SEPULVEDA, Petitioner,

v.

**IMMIGRATION AND NATURALIZA-
TION SERVICE, Respondent.**

No. 86–7536.

United States Court of Appeals,
Ninth Circuit.

Dec. 20, 1988.

Mark Rosenbaum, ACLU Foundation of Southern California, and Peter A. Schey, Nat. Center for Immigrants' Rights, Inc., Los Angeles, Cal., for petitioner.

Robert C. Bonner, U.S. Atty., Frederick M. Brosio, Jr., Asst. U.S. Atty., Chief, Civil Div., and Michael C. Johnson, Sp. Asst. U.S. Atty., Los Angeles, Cal., for respondent.

Before TANG, PREGERSON and NORRIS, Circuit Judges.

## ORDER AND OPINION

Jose Ramon–Sepulveda seeks attorneys' fees under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d)(1)(A) (Supp. III 1985). We grant his motion for fees; however, except for an inflationary adjustment, we decline to award fees in excess of the $75 statutory maximum.

### I

The facts of this case are set forth in detail in our two previous opinions, *Ramon–Sepulveda v. INS*, 743 F.2d 1307 (9th Cir.1984) (*Ramon–Sepulveda I*), and *Ramon–Sepulveda v. INS*, 824 F.2d 749 (9th Cir.1987) (*Ramon–Sepulveda II*). The following facts are relevant here. In 1978, the INS unsuccessfully tried to prove that Ramon–Sepulveda was deportable. The immigration judge terminated the deportation proceeding after finding that the government had presented no evidence of deportability. Several months later, the INS moved to reopen the proceeding to present new evidence: a birth certificate that assertedly proved alienage. The immigration judge granted the motion, and the BIA affirmed. We held that the BIA abused its discretion in affirming the immigration judge's decision to reopen the proceedings. We reversed on the ground that the INS had failed to show that the birth certificate could not have been discovered before the initial hearing. Such a showing is required by the INS' regulations. *Ramon–Sepulveda I*, 743 F.2d at 1309–10 (applying 8 C.F.R. § 242.22).

Undaunted by *Ramon–Sepulveda I*, the INS commenced a second deportation proceeding against Ramon–Sepulveda in 1986, using the same birth certificate as evidence of deportability. We granted mandamus and ordered that the second deportation proceeding be terminated. *Ramon–Sepulveda II*, 824 F.2d at 751. We held that, "[b]ecause the initial decision [was] res judicata, the INS at the very least is precluded from seeking to deport petitioner based on the same matters that were resolved in the earlier deportation proceedings." *Id.* at 750–51. Ramon–Sepulveda now seeks to recover attorneys' fees incurred in the prosecution of the mandamus action and the preparation of this motion.

### II

Under the EAJA, we must award fees to a prevailing party unless the government can demonstrate that its position was "substantially justified" or that special circumstances would make a fee award unjust. 28 U.S.C. § 2412(d)(1)(A) (Supp. III 1985). In making this assessment, we examine both the government's position during litigation and the agency action that led to the litigation. 28 U.S.C. § 2412(d)(2)(D); *Andrew v. Bowen*, 837 F.2d 875, 878 (9th Cir.1988) (citing H.R. Rep. No. 99–120, Part I, 99th Cong., 1st Sess. 9, 16, *reprinted in* 1985 U.S.Code Cong. & Ad.News 132, 137, 144). A lack of judicial precedent adverse to the government's position does not preclude a fee award under the EAJA. *See Oregon Environmental Council v. Kunzman*, 817 F.2d 484, 498 (9th Cir.1987) (refusing to affirm the district court's denial of fees on the "broad ground" that the absence of adverse precedent rendered the government's position substantially justified).

"Substantial justification" is equated with "reasonableness." H.R.Rep. No. 1418, 96th Cong., 2d Sess. 10, *reprinted in* 1980 U.S.Code Cong. & Ad.News 4953, 4989. The government's position is "substantially justified" if it "has a reasonable basis in law and fact." *Pierce v. Underwood*, —— U.S. ——, 108 S.Ct. 2541, 2550 n. 2, 101 L.Ed.2d 490 (1988). Under this standard, the government has failed to show that its position was substantially justified.

### A

The INS argued when opposing mandamus that " '[r]es judicata is inapplicable in deportation proceedings.' " *Ramon–Sepulveda II*, 824 F.2d at 750. This position was not only incorrect, *see id.* (quoting *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966)), but directly contradicted the position taken by the INS in an earlier deportation case. *See*

*Artukovic v. INS,* 693 F.2d 894, 896, 898 (9th Cir.1982) (INS urged BIA to give res judicata effect to findings made in Artukovic's earlier deportation hearing).

The INS' position in *Artukovic* was premised on the uncontradicted notion that res judicata *can* apply in deportation proceedings; the INS argued here that it *cannot.* Compare *Artukovic,* 693 F.2d at 898 (INS sought to rely on res judicata effect of suspension of deportation hearing) *with Ramon–Sepulveda II,* 824 F.2d at 750 (INS "asserts that '[r]es judicata is inapplicable in deportation proceedings' "). When the government makes an argument in one case that is contrary to an argument it made in an earlier case, we hesitate to find its legal position substantially justified. *See International Woodworkers of America, AFL–CIO v. Donovan,* 792 F.2d 762, 765 (9th Cir.1986) (government's position not substantially justified when the government urged one interpretation of a regulation in one case and a contrary interpretation in another); *see also Spencer v. NLRB,* 712 F.2d 539, 561 (D.C.Cir.1983) ("[W]hen the government acts inconsistently, and subsequently loses a civil suit challenging its behavior, it should be obliged to make an especially strong showing that its legal arguments were substantially justified in order to avoid liability for fees under the EAJA.") (emphasis deleted), *cert. denied,* 466 U.S. 936, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984).

"Relitigation of a previously decided issue is a strong factor weighing against the government in determining substantial justification." *Save Our Ecosystems v. Clark,* 747 F.2d 1240, 1250 (9th Cir.1984). At the time the INS took its position, it was well established that res judicata could be applied to administrative decisions in which parties had adequate opportunity to litigate. *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). We

therefore find this position of the government substantially unjustified.

**B**

As an alternative to its argument that res judicata does not apply in deportation proceedings, the government argued here that res judicata is applied flexibly in the administrative sphere. This is correct as a general proposition. *See Artukovic,* 693 F.2d at 898. It does not follow, however, that the INS' position here is "substantially justified." Its position—that "the INS may institute new deportation proceedings in a situation where alienage was not demonstrated at a prior hearing and the INS is presently in possession of evidence demonstrating alienage"—is inconsistent with its own regulations.

In reaching this conclusion, we must read the regulations in context. We are guided by the recent admonition of the Executive Office for Immigration Review, made in connection with the adoption of new INS regulations: "[The] rules of procedure are not intended to be read in a vacuum.... [E]ach rule of procedure is intended to be construed harmoniously with existing regulations...." 52 Fed. Reg. 2931 (Jan. 29, 1987). We consider here the INS regulations as they existed in 1986, when the INS reinstituted deportation proceedings against Ramon–Sepulveda. Although the regulations have undergone some revision since that time, nothing in the current regulations suggests that our conclusion is incorrect.

As an initial matter, we note that the INS is correct in stating that its regulations do not expressly prohibit it from reinstituting deportation proceedings after an adverse judgment.[1] Such a prohibition, however, is implicit in the regulatory scheme. The 1986 regulations provide that "[t]he order of the [immigration judge] shall be *final* except when the case is certified to the Board ... or an appeal is taken to the Board...." 8 C.F.R. § 242.20 (1986) (emphasis added).[2] The regulations allow

---

1. Nor, of course, do they provide for such a procedure.

2. This finality rule is now codified in two sections: section 3.37 ("Except when certified to

the Board, the decision of the Immigration Judge becomes final....") and section 242.20 ("The decision of the Immigration Judge [in a deportation proceeding] shall become final in

the immigration judge to reconsider or reopen proceedings after the judge has rendered a final decision, as long as jurisdiction has not vested in the BIA. 8 C.F.R. § 242.22 (1988). Whether to reopen proceedings is a matter entirely within the discretion of the immigration judge. *See id.*, ("The immigration judge *may* ... reopen or reconsider any case in which he/she had made a decision....") (emphasis added). This discretion, however, is limited: an immigration judge may *not* reopen proceedings unless he or she is "satisfied that evidence sought to be offered is material and was not available and could not have been discovered or presented at the hearing...." *Id.*

This requirement—that the new evidence be material and previously not discoverable—ensures that final decisions will not be disturbed needlessly. It also encourages the parties to prepare their cases diligently, by precluding them from presenting at a later date evidence that could have been presented at the hearing. As the Supreme Court recently acknowledged, there is "a strong public interest in bringing litigation to a close as promptly as is consistent with the interest in giving the adversaries a fair opportunity to develop and present their respective cases." *INS v. Abudu*, — U.S. —, 108 S.Ct. 904, 913, 99 L.Ed.2d 90 (1988) (explaining why motions to reopen deportation proceedings are disfavored). The INS regulations quoted above advance that interest by ensuring that the immigration judge's decision will remain final unless appealed to the BIA, or unless the immigration judge—as a discretionary matter—chooses to reconsider or reopen the case.

Under the INS' approach in this case, the immigration judge's decision is *never* final as long as the INS has some evidence demonstrating alienage. Under a broad reading of the INS' approach, it is irrelevant whether that evidence could have been discovered at the time of the hearing. Even if the evidence could serve as a basis for a motion to reopen—that is, if it could *not* have been discovered at the time of the

hearing—the INS would have no incentive to file a motion to reopen. The agency would be better off to reinstitute deportation proceedings and be assured of a hearing than to file a motion to reopen and run the risk that the immigration judge might exercise his or her discretion to deny the motion. Under this reading of the INS' position, the agency could bypass its own regulations.

The INS' position is equally implausible if limited to situations in which the "new" evidence could *not* serve as a basis for a motion to reopen. Under such a reading, the INS would be assured of a new hearing if the "new" evidence could have been discovered at the time of the initial hearing; although such evidence would not satisfy the requirements for a reopening of the initial proceeding, it would—under this reading of the government's approach—justify an entirely new proceeding. If, however, the evidence were truly "new"—that is, if it could not have been discovered at the time of the initial hearing—the INS would be allowed to present the evidence only if the immigration judge exercised his or her discretion to reopen the proceedings. Under this reading of the INS' approach, the agency's likelihood of success is inversely proportional to its diligence: the INS would be in a better litigational posture if it sought to present evidence that it could have—but failed to—offer at the initial deportation hearing.

Under either reading of the INS' approach, the INS has little incentive to investigate a case fully. If it fails to prove its case in any deportation hearing because of lack of diligence, it may continue to search out new evidence, knowing that it may institute a new proceeding at any time. This approach could result in endless relitigation.

Because the INS' position is inconsistent with its own regulations, we owe it no deference. *See United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977) (agency's interpretation of regulation is not controlling if it is inconsistent with the regulation itself).

accordance with § 3.37....") 8 C.F.R. §§ 3.37, 242.20 (1988).

In sum, the government acted unreasonably when, having failed to earn a reopening of the initial deportation proceedings, it sought to commence new deportation proceedings. Its approach flouted not only our mandate, *see Ramon–Sepulveda II,* 824 F.2d at 751, but its own regulations. The government had its opportunity to prove its case before the immigration judge. Having failed to do so, and having failed to meet the requirements for a reopening, it was not entitled to a second shot.

### C

The government's argument that special circumstances make a fee award unjust in this case is essentially a recitation of its substantial justification argument. We are unpersuaded. We conclude that the government has failed to meet its burden of showing that fees should not be awarded.

### III

■ When determining the amount of the fee to be awarded under section 2412(d)(2)(A) (Supp. III 1985) of the EAJA, we must base the attorneys' fees "upon prevailing market rates for the kind and quality of the services furnished...." However, such fees "shall not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A)(ii) (Supp. III 1985).

It is not contested in the case before us that the "kind and quality" of the services provided to Ramon–Sepulveda by attorneys Mark Rosenbaum, Lee O'Connor, and Peter Schey would justify an award of more than $75 per hour, were it not for the statute's recommended limit.[3]

Ramon–Sepulveda contends that he is entitled to fees in excess of $75 per hour because the number of attorneys qualified to assist him in his proceedings against the INS is limited, and because the cost of living has increased since the date Congress enacted the EAJA. In light of the Supreme Court's decision in *Pierce v. Underwood,* —— U.S. ——, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (reviewing EAJA award by then U.S. District Judge Pregerson), we must adhere to the $75 per hour recommended limit, as adjusted for inflation.

In *Underwood,* the Supreme Court called the recommended limit a "$75 cap," *id.* 108 S.Ct. at 2553, 2554, and recognized "the need to preserve [its] intended effectiveness." *Id.* at 2554. According to the Court,

> the exception for "limited availability of qualified attorneys for the proceedings involved" must refer to attorneys "qualified for the proceedings" in some specialized sense, rather than just in their general legal competence. We think it refers to attorneys having some *distinctive knowledge or specialized skill needful for the litigation in question*—as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation....
>
> For the same reason of the need to preserve the intended effectiveness of the $75 cap, we think the other "special factors" envisioned by the exception must be such as are not of broad and general application.

*Id.* at 2554 (emphasis added). To lend more specificity to what Congress meant by the phrase, "limited availability of qualified attorneys," the Supreme Court recognized that "an identifiable *practice specialty* such as patent law[ ] or knowledge of foreign law or language" could be considered a "special factor" under the EAJA. *Id.* (emphasis added).

Ramon–Sepulveda argues that immigration law should be classified as a practice specialty, citing to *Castro–O'Ryan v. United States Department of Immigration and Naturalization,* 821 F.2d 1415 (9th

---

3. A reasonable estimate of the value of the "kind and quality" of legal services required by, and provided to, Ramon–Sepulveda varies among the attorneys and ranges from $110 to $150 per hour. *See* Brief for Appellee at 23, 26.

Cir.1987), in which we characterized the immigration laws as " 'second only to the Internal Revenue Code in complexity.' " *Id.* at 1419 (quoting E. Hull, *Without Justice for All* 107 (1985)).

However, even if immigration law can be classified as a practice specialty, the legal problem posed in *Ramon–Sepulveda II* requires no "distinctive knowledge" or "specialized skill" as contemplated by the Court in *Underwood.* On the contrary, Ramon–Sepulveda's legal claim against the INS involves established principles of res judicata—principles with which the majority of attorneys are, or should be, familiar. Additionally, there is no shortage of attorneys in Los Angeles qualified to assist aliens in deportation proceedings.

■ Having determined that there are no "special factors" justifying an increase in the award above the $75 cap, we must now decide whether there has been "an increase in the cost of living" to justify increasing the award.

Since 1981, when Congress enacted the EAJA, the cost of living has increased substantially. As evidence of this increase, the consumer price index (figure for all urban consumers, all items, where 1967 = 100) (hereafter CPI–U) has risen from 279.9 in October, 1981 (date when Congress enacted § 2412(d)) to 350.8 in April, 1988 (date of most recent CPI–U figure available). *Current Labor Statistics,* Monthly Lab.Rev., Oct. 1981, at 83, and June 1988, at 94, respectively (hereafter *Labor Stats* ).

In *Underwood,* the Supreme Court did not discuss whether the provision in the EAJA for cost of living increases should be read as narrowly as the provision for special factors. However, we note that the district court in that case had adjusted the award in accordance with the rising cost of attorney fees. *See Underwood v. Pierce,* 761 F.2d 1342, 1347 (9th Cir.1985) (per curiam) (hourly rates ranged from $80 in 1976 to $120 in 1982), *vacated on other grounds,* —— U.S. ——, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). Furthermore, the Supreme Court implicitly recognized that inflationary adjustment is not to be computed as a "special factor" under the statute. *See Underwood,* 108 S.Ct. at 2553, 2557 (pricing the cap at "$75 ... adjusted for inflation" while denying the existence of special factors). With this endorsement in mind, we read the provision for "an increase in the cost of living" as an indication that Congress intended the cap to be capable of fluctuating with the real market value of $75.

We can easily adjust for inflation by comparing the present cost of living with the cost of living when the $75 cap was fixed.[4] However, to do so we first must determine at what date Congress intended the cap to be fixed.

Courts implementing the cost-of-living provision of the first enactment of the EAJA routinely set the date from which such adjustments were calculated as October 1, 1981, the effective date of the Act. *See, e.g., Action on Smoking and Health v. C.A.B.,* 724 F.2d 211, 218 (D.C.Cir.1984). By its terms, however, the EAJA expired in 1984. Congress then reenacted the EAJA in 1985. The reenactment left intact the "$75" figure originally established in 1981. The question thus arises whether courts are to measure the cost of living increase provided for by the current version of the EAJA from 1981 or 1985. This appears to be a question of first impression in our circuit.

We believe that Congress, in retaining the $75 cap, did not intend that courts should ignore the inflation that had occurred between 1981 and 1985. The fact that Congress carried the $75 cap from the original act into the 1985 version of the EAJA does not mean that Congress considered and rejected the notion that courts might take into account increases in the cost of living prior to the reenactment. The retention of the $75 cap merely sug-

---

**4.** The formula works out as follows:

$$\frac{\times}{\$75/\text{hour}} = \frac{\text{CPI-U}_b}{\text{CPI-U}_a}$$

where $\times$ = the rate to be charged as a fee, where a = the date the $75 cap was fixed by Congress, and where b = the date of the most recent CPI–U figure available.

gests that Congress considered and rejected any legislative reformulation of the cap. Congress expressed no intent to deflate the real market value of the cap in 1985.

The legislative history behind § 2412(d) supports our determination that in 1985 Congress intended to maintain the original effectiveness of the 1981 provision. Section 2412(d) was reenacted in 1985 because Congress previously had repealed the provision. *See* 28 U.S.C. § 2412 note ("Repeal of Subsection (d)," effective as of Oct. 1, 1984) (1982). In 1985, when reenacting the provision, Congress declared that section 2412(d) " 'shall be effective ... *as if [it] had not been repealed ....* ' " 5 U.S.C. § 504 note ("Revival of Previously Repealed Provisions") (Supp.1985) (quoting Act of Aug. 5, 1985, Pub.L. 99–80 § 6(a), 99 Stat. 186) (emphasis added). This instruction implies that, when Congress reenacted § 2412(d), it intended to maintain the cap's 1981 real market value.

Our conclusion is in accord with that reached by the Second Circuit in *Trichilo v. Secretary of Health and Human Services,* 823 F.2d 702, 705–07 (2d Cir.1987). After canvassing the legislative history of Congress' reenactment of the EAJA, that court concluded that the 1985 Congress "intended the measuring point for inflationary increases in the attorney's fee cap to be October 1, 1981." *Id.* at 707. The court explicitly rejected the government's argument that, when Congress decided in 1985 to leave the $75 cap intact, it intended to "start the cost-of-living 'meter' over again, with increases measured from 1985 dollars." *Id.* The court stated:

> Contrary to the implicit suggestion of the secretary, congress made no decision that $75, measured in 1985 dollars, was still an appropriate cap and, in effect, to roll back the increases that courts had

regularly given to keep pace with inflation between 1981 and 1985. Rather, congress simply put back in place the statutory scheme that had been allowed to lapse, without giving specific attention to the dollar amount used both as the ceiling on fees and as the base for adjustments for inflation. But the reenacted scheme included the cost-of-living adjustments that had to that point been authorized by the 1981 Act.

*Id.* at 705–06. *Accord Sierra Club v. Secretary of the Army,* 820 F.2d 513, 520–23 (1st Cir.1987).

Like the Second Circuit, we "look to the substance of what congress actually did in 1985, which was to revive a statute and provide in so doing that it should be treated as if it had not lapsed in the first place." *Trichilo,* 823 F.2d at 706. On the basis of our analysis, we conclude that when Congress reenacted the EAJA in 1985 it intended that courts continue to calculate the cost of living increase from October 1, 1981.[5]

Adjusting the $75 cap for inflation with the formula worked out *supra* note 4, the rate awarded is $94.00 per hour.[6] Attorney Mark Rosenbaum spent a total of 8.25 hours on the merits of the case (*Ramon–Sepulveda II*), and therefore he is awarded a fee of $775.50. Attorneys Lee O'Connor and Peter Schey worked on the instant appeal for 20.75 hours and 7 hours, respectively, meriting fee awards of $1,950.50 and $658.00, respectively.

SO ORDERED.

---

**5.** We are aware that other courts have reached a different conclusion. *See, e.g., Chipman v. Secretary of Health and Human Services,* 781 F.2d 545, 547 (6th Cir.1986). For the reasons stated above, however, we are unpersuaded by the reasoning which led these courts to conclude that Congress intended the cost of living increase to be calculated from 1985 rather than from 1981.

**6.**

$$\$94.00/\text{hour} = \frac{\$75/\text{hour} \times 350.8,}{279.9}$$

where $279.9$ = CPI–U for October, 1981 (date when Congress enacted § 2412(d)), and where $350.8$ = CPI–U for April, 1988 (date of most recent CPI–U figure available). *Labor Stat's,* Jan. 1982, at 81, and June 1988, at 94, respectively.