Mary E. RICHARDSON, Plaintiff,

v.

UNION OIL COMPANY OF CALIFORNIA, Defendant.

Civil Action No. 94–0098(GK).

United States District Court, District of Columbia.

May 17, 1996.

Thomas P. Meehan, Randell C. Ogg, Matthew P. Maloney, Sherman, Meehan & Curtin, P.C., Washington, DC, Rina M. Goodman, Gerard R. Lear, Speiser, Krause, Madole & Lear, Rosslyn, VA, Kevin J. McCarthy, McCarthy, Bacon & Costello, Lanham, MD, for Plaintiff.

Louis C. Woolf, Kyle W. Carpenter, Tony R. Dalton, Woolf, McClane, Bright, Allen & Carpenter, Knoxville, TN, Diane D'Aiutolo, Tydings & Rosenberg, Baltimore, MD, for Defendant.

### MEMORANDUM–OPINION AND ORDER

KESSLER, District Judge.

This matter comes before the Court on Plaintiff's Motion for Sanctions, Defendant's Opposition, and Plaintiff's Reply. The allegations of misconduct which encompass document alteration, obstruction of discovery, and misrepresentations to the Court are most serious.

### I. Factual Background

This is a product liability case. The plaintiff Mary E. Richardson, suing as personal representative of the estate of her husband William P. Richardson, alleges that her husband developed, and eventually died from, acute myelogenous leukemia ("AML") because of exposure to benzene contained in a cleaning solvent which he used continually from 1980 to 1992 in his job as a technician for the Voice of America in Washington, D.C.

The product in question is referred to as "Red Stuff" or "Long Life"[1] and was composed, in large part, of two chemicals produced at either the Beaumont, Texas or Chicago, Illinois refinery owned and operated by Defendant Union Oil Company of California ("Unocal"). The two products, lactol spirits and xylene, were then shipped to Unocal's distribution center in Tucker, Georgia, and then sold to Filmagic Products, Inc., the manufacturer of Red Stuff, Filmagic, Inc. That manufacturer then blended the two ingredients, bottled them, and shipped the final product, Red Stuff, to the Voice of America.

All parties agree that a central issue in this litigation is whether the lactol spirits and xylene produced by Unocal refineries contained sufficient quantities of benzene to have caused William Richardson's leukemia. Consequently, soon after filing suit Plaintiff directed her discovery activities to obtaining crucial information about the benzene content of the product in question.

In pages 3–13 of its Memorandum In Support of Plaintiff's Motion for Sanctions, Plaintiff presents in great detail the history of its efforts to obtain discovery from Unocal. There is no need to repeat those ten pages, especially in light of the fact that Unocal can not and does not deny any of the facts presented.[2]

■ That history demonstrates, by clear and convincing evidence,.the following:

1. In its January 20, 1995 discovery responses, Unocal produced documents relating only to xylene, only from 1981 forward, and only from its Chicago refinery, despite the fact that the discovery request included lactol spirits as well as xylene, from 1975 to the present, and covered the Beaumont as well as Chicago refinery.

2. At the February 8, 1995, Rule 30(b)(6) deposition of Linda Haddock, it was acknowledged that the Beaumont refinery existed, that there were code stock analyses from Beaumont which were relevant, and that such data had not been produced.

3. In a letter of February 21, 1995, Unocal trial counsel agreed to supplement its initial document production responses by March 8, 1995. On March 16, 1995, Unocal produced documents which had been altered by a paralegal on its legal staff named Suzan Lauderback. That paralegal had worked for Unocal for at least seven years, received formal training at the Roosevelt University Lawyer's Assistant Program, and had worked on twenty different benzene cases two of which involved the Beaumont refinery. In supplementing Defendant's discovery responses to its initial document production by providing the code stock analyses for lactol spirits in 1975, 1977, and 1979, the paralegal deleted all references to the Beaumont test results, and removed a document heading entitled "Volume Percent" at the top of the document which would have alerted any knowledgeable reader that the document had been redacted.[3] No explanation was given

---

1. Its full name is Filmagic Long Life Recorder Head Cleaner.

2. There is, of course, no question that Unocal has a very different interpretation of those facts, and the Court will address those arguments, infra.

3. The deletion was of great adverse significance to Plaintiff's case. For example, in 1977, the data for the Chicago refinery showed no benzene in lactol spirits, whereas the data for the Beaumont refinery showed 2100 ppm for lactol spirits. On March 16, 1995, Unocal produced only

for the absence of any Beaumont data, which had been requested.

4. On March 16, 1995, Unocal verified its Supplemental Responses to Plaintiff's First Interrogatories, based upon the additional documents it had just produced, and reported that lactol spirits contained benzene "from non-detect to eleven (11) parts per million". That verified answer was false. As already noted, Unocal had in its possession documents reflecting that lactol spirits contained up to 2100 ppm benzene, not 11 ppm.

5. On April 18, 1995, Unocal again supplemented its responses to Plaintiff's initial discovery requests and produced what it represented to be the code stock analyses for xylene for 1975, 1977, and 1979. Once again, the same paralegal deleted all references to the Beaumont test results and removed the document heading at the top of the document entitled "Percentage Volume" which would have alerted the reader to document redaction. Again, no explanation was given for the absence of any Beaumont data, which had been requested.

6. On April 19, 1995, in its Opposition to Plaintiff's Motion to Compel, Unocal represented to the Court that it had produced all code stock analyses for lactol spirits and that it had searched all places where documents of the type requested by Plaintiff would reasonably be expected to be found. Defendant had to have been referring to the Beaumont and Chicago refineries since Plaintiff's Motion repeatedly requested data from both. These representations were false, since Unocal had in its possession the Beaumont data already discussed. Moreover, the same legal assistant who altered two different sets of documents and prepared the false Answers to Interrogatories already discussed, assisted in preparing the April 19, 1995 Opposition. Finally, Unocal had not, in fact, searched its Beaumont facility, or its Chicago facility—all locations where the pertinent documents

were very likely to be found and where some documents were found after entry of Court Orders.

7. Finally, on May 22, 1995, in response to a Court Order issued May 10, 1995, which Unocal had opposed, the Defendant produced unaltered copies of the Beaumont test data. At that point, Plaintiff's counsel finally discovered the prior alteration of documents.

In the face of serious wrongdoing, Unocal defends itself by responding that this was just a single mistake, that it was promptly corrected, that it did not prejudice Plaintiff, and that "Plaintiff is trying to make a mountain out of a mole hill".[4]

Again, Plaintiff spends many pages picking apart the inherent lack of credibility of the explanations offered by Defendant. First, suffice it to say that this Court does not believe for one moment that a legal assistant with seven years of experience, who had worked on at least 20 benzene cases, would take it upon herself to alter documents, withhold information, and give false responses in verified court documents unless she had reason to believe that she was acting with either the tacit or overt approval of her superiors. Nor, for all the reasons given by the Plaintiff, does the Court believe that this legal assistant altered documents by "mistake." Moreover the fact she was "chastised"—not fired outright for a grave infraction, not demoted, not put on probation, not even given a written reprimand in her personnel folder[5]— speaks louder than any post-hoc explanation in a legal brief about the attitude of her superiors toward her flagrant misconduct.

Second, it is significant that the only reason that these matters were fully exposed to public view was because of the Court's intervention. Defendant vigorously opposed every effort to compel further search of its facilities, to produce more data, to take a 30(b)(6) deposition and, in particular, to take

the altered code stock analyses from the Chicago refinery for lactol spirits for 1975, 1977, and 1979, showing that the product contained only between "nondetect" to 11 ppm benzene.

4. Defendant's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Sanctions, p. 27.

5. In fact, she was given at least one raise. The record is not entirely clear as to whether she received a second raise.

the deposition of the paralegal. After suspecting that they were not getting all the data they thought existed, and then learning that there had been alterations made to certain key tables of data, Plaintiff's counsel were totally justified in using all the discovery techniques at their disposal to try to establish the facts fully and clearly before coming to this Court for the imposition of sanctions. Plaintiff's counsel were hardly in a position to rely on the "good faith assurances" of trial counsel that all discovery obligations had been met.[6]

Third, the issue is hardly one of "prejudice" to the Plaintiff. Defendant seems to be arguing that because Plaintiff's counsel were alert enough—or suspicious enough—or diligent enough—to question the accuracy and sufficiency of the data produced and then to insist that the Court compel compliance with the discovery rules, Defendant is absolved from responsibility for its conduct. Plaintiff was simply fortunate. She could just as easily have been denied access to the crucial data from the Beaumont refinery and have lost her case. Discovery is not just a game where all that counts is the ultimate score no matter how unethically the players behaved. Rather, the discovery rules are intended to provide a procedural framework in which lawyers—trained to be professionals and to honor their commitments to the justice system—provide information and data to each other so that cases can be resolved in a more efficient—and hopefully more just—fashion.

In short, the Court finds, by clear and convincing evidence, the shifting and sometimes inconsistent excuses, evasions, and explanations offered by Unocal to be neither credible nor persuasive.

## II. *Legal Analysis*

Plaintiff asks the Court to exercise its "inherent powers" to impose sanctions and, in particular, to enter a default judgment; barring that, Plaintiff asks the Court to either enter an issue preclusion sanction or allow the jury to hear the evidence about document alteration so that it can draw its own conclusions. Finally Plaintiff asks for an award of attorneys' fees.

■ In *Shepherd v. American Broadcasting Companies*, 62 F.3d 1469, 1471–1472 (D.C.Cir.1995), our Court of Appeals recently reviewed the authority of a district judge to punish litigation misconduct, and held that "a district court may use its inherent power to enter a default judgment only if it finds, first, by clear and convincing evidence—a preponderance is not sufficient—that the abusive behavior occurred; and second, that a lesser sanction would not sufficiently punish and deter the abusive conduct while allowing a full and fair trial on the merits." Thus, there is now no question that, with the appropriate safeguards outlined by the Court of Appeals, a district court may exercise its inherent powers to punish litigation misconduct by entering a default judgment against the offending party.

As to the first requirement set forth by the Court of Appeals, this Court has already found, by clear and convincing evidence, that such misconduct occurred during the discovery phase of this litigation. However, that does not end the inquiry.

■ After finding the existence of serious and repeated instances of litigation misconduct, the Court must then "calibrate the scales" in determining what sanction corresponds to the misconduct and whether a sanction less than the draconian one of default would "sufficiently punish and deter the abusive conduct while allowing a full and fair trial on the merits". *Id.*

■ Plaintiff argues that only the entry of a default judgment will effectively punish Unocal and deter similar misconduct in the future. It is clear, however, that "dismissal is a 'drastic step, normally to be taken only after unfruitful resort to lesser sanctions.'", *Ripalda v. American Operations Corp.*, 977 F.2d 1464, 1466 (D.C.Cir.1992) (quoting *Jackson v. Washington Monthly Co.*, 569 F.2d 119, 123 (D.C.Cir.1977)), quoted with approval in *Shepherd*, 62 F.3d at 1478. Our legal system has a strong presumption in favor of adjudication on the merits. Entry of a de-

6. The Court is well aware from the pleadings that Plaintiff's counsel believe that in-house corporate counsel were responsible for the events which have transpired, not trial counsel.

fault judgment would obviously not just frustrate, but obliterate, that presumption.

■ Despite the very serious nature of the misconduct engaged in in this case—including direct misrepresentations in pleadings submitted to the Court and alteration of documents—the Court concludes, for the following reasons, that this is not a case in which only the extreme remedy of default will both punish and deter the Defendant.

First, fortunately, Plaintiff through the alertness, diligence, and tenacity of her counsel learned of the misconduct and obtained the accurate data well in advance of trial, in advance of the conclusion of discovery, and in advance of reaching any binding settlement. In short, Plaintiff's ability to present her full case to the jury was not compromised in any way, although she clearly lost some time and a lot of lawyer energy. While Plaintiff is correct that her case would have been seriously (if not fatally) weakened by the incomplete and inaccurate data submitted by Defendant, the fact is that that did not happen, and therefore Plaintiff was not harmed.

Second, no court order was directly violated. Indeed, it was only by complying, despite vigorous preliminary objections, with this Court's discovery Orders that Plaintiff did obtain the data she needed and a full understanding of the misconduct which occurred.

Third, a default judgment—the ultimate weapon in the sanctions arsenal—should be reserved for only the most flagrant, egregious situations in which there have been repeated, willful instances of litigation misconduct which have seriously impaired the ability of the other party to investigate, develop, and present their case. As serious as

this case is, it does not, in this Court's judgment, meet that standard.

However, as our Court of Appeals has made clear, trial courts have other inherent power sanctions available to them, including "fines, awards of attorneys' fees and expenses, contempt citations, disqualifications or suspensions of counsel, and drawing adverse evidentiary inferences or precluding the admission of evidence." *Shepherd*, 62 F.3d at 1475. The Court now considers these alternative sanctions.

First, there can be no question that attorneys' fees and expenses are appropriate and will be awarded.[7]

Second, Defendant Unocal will be precluded from presenting any evidence or argument that there was insufficient benzene in the lactol spirits or xylene produced at its Beaumont refinery to cause Mr. Richardson's AML.

Third, Plaintiff will be permitted to present evidence relating to the Defendant's document alteration and misrepresentations to the Court on this issue including the manner in which Defendant handled the disciplining of the paralegal.[8]

■ While Plaintiff makes some *very* persuasive arguments, at pp. 31–39 of her Memorandum in support of the Sanctions Motion, that such sanctions will not adequately deter a legally sophisticated corporate giant like Unocal from once again gambling that misconduct by its legal staff would go undetected and thereby gravely impair the merits of some other plaintiff's case, the Court concludes, albeit with some real concern, that the absolute nature of the default sanction is simply not commensurate with the misconduct and its consequences.[9] Imposition of

---

7. The Court warns counsel now that it does not expect to see this issue litigated. Plaintiff's counsel are to present an accurate and reasonable fee petition to Defendant, and this is to be honored, barring extraordinary disagreements. Sanctions will be imposed against the losing party, if the issue is presented to the Court.

8. Plaintiff argues that a fine would neither deter future misconduct by Defendant nor punish it for past misconduct, given the fact that it is a multibillion dollar corporation. The Court agrees.

9. In *Shepherd,* the Court of Appeals noted that

"courts generally respond to document destruction or alteration with the ultimate sanction of dismissal or default in two types of cases: where the destroyed document is dispositive of the case, so that an issue-related sanction effectively disposes of the merits anyway ...; and where the guilty party has engaged in such wholesale destruction of primary evidence regarding a number of issues that the district court cannot fashion an effective issue-related sanction, ..." 62 F.3d at 1479 [citations omitted].

the particular sanctions chosen is directly related to both the particular issue which was the subject of altered documents and misrepresentations and to the manner in which the misconduct occurred.

One final issue remains—and that is of both professional and corporate responsibility. The real culprit is not some low-level paralegal who has taken a course on how to be a legal assistant. That paralegal works in a general counsel's office employing approximately 40 attorneys. She is supervised by attorneys, and those line attorneys are presumably supervised by the general counsel. They are the persons immediately responsible for what occurred in this case just as the Defendant is ultimately responsible for the actions of its employees taken in the course of their employment.

Plaintiff's counsel has not fully addressed that issue. The Court will await more specific requests from counsel and is prepared to consider, *inter alia,* referrals to the appropriate Supreme Court and Office of Bar Counsel in the state(s) in which the lawyers involved are admitted to practice.[10]

Wherefore, it is this 17th day of May, 1996 hereby

ORDERED, that Plaintiff's Motion for Sanctions is **granted**; and it is further

ORDERED, that at trial Defendant is precluded from presenting any evidence or argument that there was insufficient benzene in the lactol spirits or xylene contained in the Red Stuff used by Mr. William Richardson in his employment at Voice of America to have caused his AML; and it is further

ORDERED, that at trial Plaintiff may present evidence regarding document alteration and misrepresentations to the Court on the issue of the benzene content of the lactol spirits and xylene contained in the Red Stuff used by Mr. William Richardson in his employment at the Voice of America, and such evidence may also relate to the disciplining of the paralegal involved; and it is further

ORDERED, that Plaintiff shall be awarded her attorneys' fees and costs incurred in connection with this Motion and all discovery matters related the discovery abuses discussed herein; and that Plaintiff shall serve a fee petition on Defendant within 30 days from the date of this Order.

### ORDER

This matter came before the Court upon Defendant's Motion In Limine for an Order Excluding Evidence Concerning Redaction of Documents. Upon consideration of the Motion, the Opposition, and the Reply, and for all the reasons stated in the Court's Memorandum–Opinion issued this date, the Motion is **denied**.

---

**10.** See Joseph, *Sanctions: The Federal Law of* *Litigation Abuse,* § 28(B)(4), 2nd ed. (1994).