Dubois v. US Dept. of Agriculture    CV-95-050-B    07/17/98

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


**Roland C. Dubois, et al.**

       **v.**                          Civil Action No. 95-50-B

**U.S. Dep't of Agriculture, et al.**


**MEMORANDUM AND ORDER**

Roland Dubois seeks to compel the United States to reimburse him for certain fees, expenses, and attorneys fees he incurred in litigating this action.  I reject Dubois' request for attorney's fees, but conclude that he is entitled to recover a portion of his fees and expenses.


**I.    BACKGROUND**[1]

Loon Mountain Recreation Corporation ("Loon") operates a ski area in northern New Hampshire.  Because part of its ski area lies within the White Mountain National Forest, Loon's operations require a special-use permit issued by the United States Forest Service.  16 U.S.C.A. § 497b (West Supp. 1998).  In 1986, Loon asked the Forest Service to amend the permit to allow it to expand its ski operations.  After several years of review, the Forest Service issued a Record of Decision ("ROD") approving a

---

[1]  I limit my discussion of the history of this case to those facts, procedural developments, and contentions relevant to Dubois' motions for costs and fees.  For a more thorough discussion of the history of this case, see my November 2, 1995 Order or the subsequent First Circuit opinion, reported at 102 F.3d 1273 (1st Cir. 1996).

revised version of Loon's expansion plan. The Forest Service then amended Loon's special-use permit, incorporating into it the terms and conditions of the ROD.

Dubois filed this action, seeking to compel the Forest Service to revoke any permits and approvals issued under the ROD and to enjoin Loon from proceeding with its expansion plan. Dubois was joined in his claims by intervenor Restore: The North Woods ("Restore"), an environmental organization. Loon intervened as a defendant. Plaintiffs contended, inter alia, that: (1) the ROD violated the Federal Water Pollution Control Act, 33 U.S.C.A. § 1251 et seq. (West 1986 & Supp. 1998), better known as the Clean Water Act ("CWA"), because it allowed Loon to discharge water from the East Branch of the Pemigewasset River (the "East Branch") into Loon Pond without first obtaining a National Pollution Discharge Elimination System ("NPDES") permit, as required by 33 U.S.C.A. § 1342(a); and (2) the Forest Service violated the National Environmental Policy Act ("NEPA"), 42 U.S.C.A. § 4332 et seq. (West 1994), by failing to consider various alternatives to Loon's proposal in its Environmental Impact Statement ("EIS").[2]

On November 5, 1995, I issued a Memorandum and Order rejecting plaintiffs' claims. However, the Court of Appeals reversed this order and directed me to enter summary judgment in

_____

[2] Plaintiffs also asserted that the Forest Service's approval of the expansion plan violated several other provisions of NEPA, Executive Order 11,990, and New Hampshire's Water Quality Standards.

plaintiffs' favor. See Dubois v. United States Dept. of Agric., 102 F.3d 1273, 1301 (1st Cir. 1996). The Court of Appeals accepted plaintiffs' contention that Loon needed a NPDES permit in order to discharge water from the East Branch into Loon Pond. Id. at 1296-99. It also concluded that the Forest Service had violated NEPA because, among other things, it had failed to adequately consider the possibility of building on-sight storage ponds as an alternative to using Loon Pond as a water source for snow-making. Id. at 1289-90.

## II.

Dubois began the current phase of the litigation by filing a motion in December 1997, seeking to recover the costs and expenses he incurred in litigating his claims. He later supplemented that effort with a second motion seeking attorney's fees. Dubois bases his claims on: (1) the court's inherent power to sanction litigants for acting "in bad faith, vexatiously, wantonly, or for oppressive reasons," Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991); and (2) The Equal Access to Justice Act, 28 U.S.C.A. § 2412 (West 1994 & Supp. 1997) ("EAJA"), which allows a prevailing party to recover costs, expenses, and attorneys fees in a suit brought by or against the United States unless the government's position was "substantially justified or that special circumstances make an award unjust." The government objects to both motions, contending that sanctions are un-warranted because it did not act in bad faith and an award under

the EAJA would be improper because its litigation positions were "substantially justified." I address each argument in turn.

## A. Sanctions

Although the "American Rule" on fee-shifting traditionally bars a prevailing party in federal court from recovering attorney's fees, Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975), a district court may "use its inherent powers to assess attorneys' fees against a party that has 'acted in bad faith, vexatiously, or for wanton or oppressive reasons.'" Whitney Bros. Co. v. Sprafkin, 60 F.3d 8, 13 (1st Cir. 1995) (internal quotations omitted) (quoting Chambers, 501 U.S. at 45-46). The inherent power to sanction bad faith litigation tactics serves the dual purposes of "vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy." Chambers, 501 U.S. at 46 (internal quotations omitted) (quoting Hutto v. Finney, 437 U.S. 678, 689 n.14 (1978)). Because of its potency, however, the power to sanction "must be exercised with restraint and discretion." Chambers, 501 U.S. at 44. Consequently, "a court's inherent power to shift attorney's fees 'should be used sparingly and reserved for egregious circumstances.'" Whitney Bros., 60 F.3d at 13 (quoting Jones v. Winnepesaukee Realty, 990 F.2d 1, 3 (1st Cir. 1993)).

To invoke the so-called "bad faith" exception to the American Rule on fee-shifting, the moving party must establish

by clear and convincing evidence that its opponent has acted in bad faith, vexatiously, or for wanton or oppressive reasons.  See Dow Chemical Pacific Ltd. v. Rascator Maritime S.A., 782 F.2d 329, 344 (2d Cir. 1986) (internal quotations omitted); Shepherd v. American Broadcasting Co., 62 F.3d 1469, 1477, 1484 (D.C. Cir. 1995); Autorama Corp. v. Stewart, 802 F.2d 1284, 1288 (10th Cir. 1986).  Cf. Gemco Latinoamerica, Inc. v. Seiko Time Corp., 61 F.3d 94, 98 (1st Cir. 1995) (requiring clear and convincing evidence to establish civil contempt); Aoude v. Mobile Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989) (requiring clear and convincing evidence to establish "fraud on the court").  Because the exception is "intended as a sanction to remedy a display of bad faith," United States v. Horn, 29 F.3d 754, 760 (1st Cir. 1994), its invocation requires more than a showing of a weak or legally inadequate case.  See Autorama Corp., 802 F.2d at 1288; Americana Indus., Inc. v. Wometco de Puerto Rico, Inc., 556 F.2d 625, 626 (1st Cir. 1977).  Rather, the movant must demonstrate that "the challenged actions [were] entirely without color and [were taken] for reasons of harassment or delay or for other improper purposes."  Dow Chemical, 782 F.2d at 344 (internal quotations omitted); Fonar Corp. v. Magnetic Resonance Plus, Inc., 935 F. Supp. 443, 448 (S.D.N.Y. 1996), vacated on other grounds, 105 F.3d 99 (2d Cir. 1997); Richardson v. Union Oil Co. of Calif., 167 F.R.D. 1, 2, 4-5 (D.D.C. 1996).

Dubois offers two arguments to support his sanctions claim. First, he asserts that the government changed its position on the

CWA issue on appeal and argues that this change evidences the government's bad faith.  Second, he claims that the government was disingenuous in responding to Dubois' NEPA claim when it dismissed as a "practical impossibility" the construction of on-site storage ponds.

1. The Clean Water Act Claim

As I explained in the November 2, 1995 Memorandum and Order, the issue of whether Loon was required to obtain a NPDES permit before transferring water from the East Branch into Loon Pond turned on whether the transfer would result in "any addition" of pollutants into the "navigable waters" as those terms are used in the CWA.  See Dubois v. United States Dep't of Agric., No. 95-50, slip op. at 10 (D.N.H. November 2, 1995).  The government argued in the district court that the proposed transfers were not "additions" to the navigable waters because the East Branch is already a part of the "navigable waters."  In its brief in opposition to Dubois' request for injunctive relief, the government stated:

> . . . the simple pumping of water between waterbodies, without any intervening use of the water, does not cause the pumped water to lose its character as waters of the United States.  Because any pollutants contained in the water drawn into the snow-making lines from the East Branch 'always remain within waters of the United States,' . . . there is no introduction of pollutants to Loon Pond from the outside world, and hence no 'addition' subject to the Act's permitting requirements.  This especially makes sense in this case where the East Branch water that is diverted to Loon Pond is of similar quality. . . .  As such, no NPDES permit is required and there is no violation of the CWA.

(Def.'s Mem. Supp. Sum. Jud. at 56-57).  Further, the government

-6-

asserted at oral argument on Dubois' request for a preliminary injunction that its position did not depend upon whether the East Branch and Loon Pond were hydrologically connected. Nor, it asserted, did it matter whether the water in the East Branch and Loon Pond were of comparable quality. (Transcript of June 14, 1995 Preliminary Injunction hearing at 79-83).

The government significantly narrowed its argument on appeal. There, it claimed that the reason Loon did not need an NPDES permit was because Loon Pond and the East Branch were hydrologically connected and East Branch water was almost as clean as the water in Loon Pond. The government did not inform the Court of Appeals that it had taken a different position in the trial court. Nor did it offer a principled construction of the CWA that would support its new position. Unsurprisingly, the First Circuit rejected the government's argument. See Dubois, 102 F.3d at 1299.

Although it was disconcerting to learn that the government took one position in my court and a different position on appeal, a litigant generally is free to change the rationale for its position at any point during the life of a case or, for that matter, in subsequent, unrelated litigation. Moreover, nothing in the circumstances surrounding the government's change of position here suggests that the arguments it offered in my court were made in bad faith. Accordingly, I reject Dubois' claim that the government should be sanctioned for the way in which it

-7-

litigated the CWA issue.[3]

---

[3] Dubois argues that the government compounded its bad faith by opposing Loon's petition for certiorari before the Supreme Court. In that petition, Loon argued that the First Circuit's decision created a circuit-court split on the issue of whether an NPDES permit is required to withdraw water from and return it to the same body without adding any pollutants. The government correctly noted that the First Circuit opinion did not decide that issue, but rather held only that the addition of water from one navigable water, the East Branch, to another, Loon Pond, requires an NPDES permit. See Dubois, 102 F.3d at 1299. The government opposed certiorari not necessarily because it agreed with the First Circuit's conclusion in this regard but because it did not believe that the opinion created a circuit-court split worthy of Supreme Court review. Consequently, the government's opposition to Loon's petition for certiorari does not evidence bad faith or vexatiousness.

## 2. The National Environmental Policy Act Claim

Dubois claimed in his complaint that the Forest Service violated NEPA by failing to adequately explore reasonable alternatives to using Loon Pond as a primary source of snow-making water. In particular, he focused on the Forest Service's alleged failure to consider two public comments suggesting alternatives to using Loon Pond. The first comment, submitted by a local citizens' group, recommended that Loon construct in-stream impoundment ponds in Boyle Brook. The second comment, submitted by Dubois, proposed that Loon construct underground storage tanks on its privately-held land at the base of the mountain. Dubois also faulted the Forest Service for failing to consider the possibility of constructing other types of storage ponds that had not been specifically suggested during the public comment period.

The government responded to Dubois' claims by asserting that although the Forest Service was under a general duty to respond to public comments, it did not have to respond to comments that were unreasonable or implausible. Contending that the proposals received in both comment letters were, as a practical matter, unreasonable and "patently preposterous," the government concluded that it was under no obligation to consider or respond to them. Additionally, the government stated that it did not devote great energy to considering other types of storage ponds because "the sheer enormity of constructing comparable water storage facilities above or below ground at the base of the mountain was

a practical impossibility." (Def.'s Mem. Opp. Summ. J. at 30-1).

Dubois argues that the government took its position on the issue of water-storage ponds vexatiously and in bad faith because its representatives knew or should have known that storage ponds were a feasible alternative to using Loon Pond. To support his position, Dubois points to the fact that contemporaneous with the government's assertions before this court that constructing storage ponds at Loon would be a "practical impossibility," the Forest Service recommended, evaluated, and issued a ROD approving the construction of three water-storage ponds at the Sugarbush Ski Area in Vermont. The Sugarbush storage ponds have capacity to hold 123.5 million gallons of water, far more than the 71 million gallons the Forest Service estimated would be removed annually from Loon Pond. Arguing that the Forest Service knew, and that counsel knew or should have known, of the Sugarbush storage ponds, Dubois contends that the government's assertion before this court that constructing storage ponds at Loon's ski area was not feasible was made vexatiously or in bad faith.

I reject Dubois' bid for sanctions because he has failed to establish that either the Forest Service personnel responsible for evaluating Loon's expansion plan or government counsel knew or had reason to know of the proposed water-storage ponds at Sugarbush. To the contrary, the government has offered sub-stantial evidence rebutting any such inference. The government has submitted the affidavit testimony of both the Assistant United States Attorney representing the Forest Service, T. David

-10-

Plourde, and his litigation contact at the Forest Service, Steve Fay. Both Plourde and Fay state that in preparing responses to Dubois' NEPA claim, government counsel engaged in consultation with the Forest Service, which received and reviewed copies of every substantive submission from plaintiff and the government on the NEPA issue. Plourde had no reason to know of the proposed water-storage ponds at Sugarbush for the simple reason that neither Fay nor anyone else from the Forest Service told him about them. Fay states by affidavit that he was not aware of the Sugarbush proposal or of any other proposal involving storage ponds of the magnitude necessary to meet Loon's water needs. Nor did he know of any communication regarding such ponds between Forest Service officials responsible for evaluating Loon's plan and those responsible for evaluating Sugarbush's plan.

The government further submits evidence that the Forest Service personnel responsible for evaluating Loon's plan did not know and had no reason to know of the Sugarbush proposal. Beth LeClair, District Ranger for the Forest Service's Eastern Region Winter Sports Team, states by affidavit that prior to January 1996, each individual National Forest had the exclusive responsibility for administering the ski resorts within its borders.[4] Thus, prior to 1996, the Green Mountain National

_____

[4] In January 1996, the Forest Service created the Eastern Region Winter Sports Team in part to facilitate communication between the various National Forests with respect to the administration of ski resorts and other winter sports facilities. Thus, this team was created approximately two months after I issued my order granting summary judgment on all claims in favor of defendants.

Forest had exclusive authority over the Sugarbush Ski Area, while the White Mountain National Forest had exclusive authority over Loon's operations.

Additionally, prior to this time, the Forest Service had made no arrangement for communication among Forest Service counterparts at various National Forests with respect to the administration of alpine ski areas. Although informal conversation occurred occasionally, such communication was neither routine nor expected. LeClair states that a matter such as the means chosen for snow-making water storage would not routinely be communicated to other National Forests. Further, she states that she knows of no communication between the Forest Service personnel responsible for evaluating Loon's plans and their counterparts at the Green Mountain National Forest. To the best of her knowledge, no one at the White Mountain National Forest knew about the proposal to construct storage ponds at Sugarbush.

In light of this substantial evidence that neither government counsel nor the relevant Forest Service personnel knew or should have known of the Sugarbush proposal, I find that Dubois has failed to carry his burden of proffering clear and convincing evidence that the government's position was "entirely without color and [taken] for reasons of harassment or delay or for other improper purposes." Dow Chemical, 782 F.2d at 344 (internal quotations omitted); Fonar Corp., 935 F. Supp. at 448. Cf. Aoude, 892 F.2d at 1118 (requiring clear and convincing evidence to

-12-

establish "fraud on the court").

B. **The Equal Access to Justice Act**

The EAJA provides for an award of attorney's fees and expenses to a prevailing party other than the United States "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C.A. § 2412(d)(1)(A). The government does not dispute that Dubois prevailed on his claims or that he meets the statutory definition of a "party" eligible to make an EAJA claim, id. § 2412(d)(2)(B). Instead, the government argues that it is not obligated to pay any of Dubois' costs, expenses, or attorney's fees under the EAJA because its litigation positions were "substantially justified."

The government bears the burden of showing by a preponderance of the evidence that its litigation positions were substantially justified. De Allende v. Baker, 891 F.2d 7, 11-12 (1st Cir. 1989); Sierra Club v. Secretary of the Army, 820 F.2d 513, 517 (1st Cir. 1987); United States v. Yoffe, 775 F.2d 447, 450 (1st Cir. 1985). In order to make this showing, the government must establish that its position had a "reasonable basis in law and fact." Pierce v. Underwood, 487 U.S. 552, 565 (1988). This test, which "represents a middle ground between the automatic award of fees to a prevailing party and an award made only when the government's position was frivolous," breaks down into three parts: "did the government have a reasonable basis for the facts alleged; did it have a reasonable basis in law for the

theories advanced; and did the facts support its theory." <u>Yoffe</u>, 775 F.2d at 450; <u>see</u> <u>also</u> <u>De Allende</u>, 891 F.2d at 11-12. That the government lost the underlying litigation does not mandate a finding that its position was not substantially justified. <u>Pierce</u>, 487 U.S. at 569; <u>Sierra Club</u>, 820 F.2d at 517. Conversely, that the government prevailed at some earlier stage of the litigation does not necessarily exempt it from liability under the EAJA. <u>Id.</u>

Dubois argues that the government was not substantially justified in claiming that building storage ponds as an alternative to using Loon Pond was a "practical impossibility." I address his arguments by first examining the two specific proposals suggested during the public comment period and then examining the government's position with respect to other types of storage ponds that were not specifically suggested.

1. <u>The Specific Proposals</u>

As a general matter, the Forest Service was under no obligation to consider remote, speculative, or fanciful alternatives or suggestions. <u>See</u> <u>Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.</u>, 435 U.S. 519, 551 (1978); <u>Roosevelt Campobello Int'l Park Comm'n v. United States EPA</u>, 684 F.2d 1041, 1047 (1st Cir. 1982). <u>Cf.</u> <u>Dubois</u>, 102 F.3d at 1288 n.16 (recognizing the possibility that a proposal may be so "facially vulnerable" that it may not require an explicit agency response). Rather, the Forest Service was required to consider only "reasonable" or "feasible" alternatives

to the proposed action. See Vermont Yankee, 435 U.S. at 551 ("To make an impact statement something more than an exercise in frivolous boilerplate[,] the concept of alternatives must be bounded by some notion of feasibility."); Valley Citizens for a Safe Env't v. Aldridge, 886 F.2d 458, 461 (1st Cir. 1989); Olmsted Citizens for a Better Community v. United States, 793 F.2d 201, 209 (8th Cir. 1986).

The government has submitted significant evidence supporting its contention that neither citizens' group's proposal nor Dubois' proposal was reasonable as a practical matter. With respect to citizens' group's proposal, the government has submitted the affidavit of Joan Carlson, a Forest Service Hydrologist. In her affidavit, Carlson states that constructing in-stream impoundment ponds on Boyle Brook of sufficient capacity to meet Loon's water needs would require a series of forty-foot-high dams in the stream constructed at elevations greater than 1500 feet. She further states that constructing such dams at that elevation would require building new roads up the mountain and would create "significant adverse environmental consequences, including the loss of in-stream habitat and organisms, the degradation of water quality, and maintenance problems due to sediment build-up." Because of Boyle Brook's small size, she continues, the impoundment ponds would have to be refilled with water from the East Branch in order to meet Loon's water needs.

With respect to Dubois's proposal of constructing underground storage tanks at the base of the mountain, the

-15-

government submits the affidavit of Steve Fay, a Soil Scientist employed by the Forest Service who also served as the litigation contact at the Forest Service throughout this case. Fay states that in the course of this litigation, he and two civil engineers employed by the Forest Service assessed the feasibility of constructing underground storage tanks of sufficient size to meet Loon's water needs. In order to meet these needs, the team concluded, the tanks would have to be approximately twenty-feet deep and would cover approximately fourteen acres of land. Additionally, the team found that the tanks would interfere with ground water run-off from the mountain, potentially leading to flooding, and would necessitate the transport and disposal of 34,000 truckloads of dirt and rock.

The government's position that it need not respond to or comment on unreasonable or unfeasible suggestions or alternatives has significant support in the case law. See, e.g., Vermont Yankee, 435 U.S. at 551-52; Campobello, 684 F.2d at 1047. That the First Circuit ultimately faulted the government for failing to consider the citizens' group's "reasonably thoughtful proposal" does not necessitate a finding that the government's position was unreasonable.[5] See Pierce, 487 U.S. at 569; Sierra Club, 820 F.2d at 517. Rather, I conclude that the government has carried its burden of showing by a preponderance of the

_____

    [5] Furthermore, the First Circuit decision recognized the practical infeasibility of Dubois's recommendation, finding that "it may or may not alone have required an explicit response, however brief." Dubois, 102 F.3d at 1288 n.16.

evidence that its position with respect to these two specific proposals involved a reasonable application of law to fact and, therefore, was substantially justified.  See De Allende, 891 F.2d at 12; Yoffe, 775 F.2d at 450.

    2.  The Independent Duty to Consider Reasonable Alternatives

    In evaluating Loon's proposed expansion, the Forest Service was under a duty to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action, 40 C.F.R. § 1502.14(a) (1997), and include that discussion in the EIS, 42 U.S.C.A. § 4332(2)(C)(iii).  Dubois contends that in neglecting to consider alternative sources for snow-making water, such as man-made water-storage ponds, the Forest Service failed to fulfill this duty.  That the Forest Service has twice recently approved the construction of water-storage ponds at nearby ski resorts -- Sugarbush Ski Area in Vermont and Waterville Valley Ski Area in the White Mountain National Forest -- illustrates that construction of similar ponds at Loon's facilities was a potentially reasonable alternative that, at the very least, was worthy of exploration and discussion.  See Dubois, 102 F.3d at 1288-89.

    The government offers no justification, however, for the Forest Service's failure to consider such water-storage ponds. Nor does the government attempt to justify its own subsequent litigation position that the Forest Service did not consider such ponds because their construction was "a practical impossibility." Consequently, I must conclude that the government has failed to

-17-

carry its burden of showing, by a preponderance of the evidence, that its litigation position with respect to this issue was "substantially justified." Allende, 891 F.2d at 12; Sierra Club, 820 F.2d at 517; Yoffe, 775 F.2d at 450. Dubois is entitled, therefore, to recover under the EAJA.[6]

### III.

Having determined that the government's position with respect to the feasibility of constructing storage ponds as an alternative to using Loon Pond was not substantially justified, I now must determine the amount to which Dubois is entitled under the EAJA.

Dubois seeks an award of attorney's fees for the time he spent working on this case as a pro se plaintiff. As an alternative, he seeks to recoup income he lost as a result of the time he took from his job as an EPA attorney to litigate this case. In addition, he seeks reimbursement for the costs and expenses he incurred in litigating his case against the government. I address the propriety of each award in turn.

### A.   Attorney's Fees

Although the First Circuit has held that a pro se litigant who is not an attorney may not recover attorney's fees under the EAJA, Crooker v. EPA, 763 F.2d 16, 17 (1st Cir. 1985), it has not expressly determined whether this prohibition applies to a pro se

---

[6] Because I find that the government's position with respect to this issue was not substantially justified and, therefore, that Dubois is entitled to recover under the EAJA, I do not reach the issue of whether the government's position with respect to the CWA issue was substantially justified.

litigant such as Dubois, who is an attorney.  When the court considered the issue in the context of a claim for fees under the Freedom of Information Act, 5 U.S.C.A. § 552(a)(4)(E) (West 1996), however, it held that pro se attorney litigants may not recover attorney's fees.  <u>Aronson v. United States Dep't of Housing and Urban Dev.</u>, 866 F.2d 1, 4-6 (1st Cir. 1989).  Moreover, the United States Supreme Court reached a similar conclusion with respect to the recoverability of fees by pro se attorney litigants under the Civil Rights Attorneys Fees Awards Act, 42 U.S.C.A. § 1998 (West 1994 & Supp. 1998).  <u>Kay v. Ehrler</u>, 499 U.S. 432, 437-38 (1991).  As Dubois has failed to offer a principled basis for distinguishing these precedents, I reject his request for attorney's fees.[7]

## B.   <u>Dubois' Lost Income</u>

As an alternative to the award of attorney's fees, Dubois seeks compensation for income he lost at work as a result of time spent litigating this case.  Dubois has failed to identify a single case in which a court has made an award of lost income as an expense under the EAJA.  Moreover, First Circuit precedent strongly suggests that income lost by a pro se litigant is not recoverable.  In <u>Crooker v. United States Dep't of Justice</u>, the

_____

[7]  In rejecting Dubois' claim for attorney's fees, I do not intend to suggest that his work was of no value to the court. Dubois is an experienced environmental lawyer who provided important assistance to the court in a number of instances. Nevertheless, the policies underlying the EAJA would not be furthered by awarding fees to Dubois for representing himself. <u>See</u> <u>Aronson</u>, 869 F.2d at 6 (noting that attorney's fee provisions of Freedom of Information Act were not intended to "so subsidize attorneys without clients").

First Circuit rejected a pro se litigant's attempt to obtain attorney's fees under the Freedom of Information Act, which the court deemed similar to the EAJA, precisely because such an award "does nothing more than subsidize the litigant for his own time and personal effort."  632 F.2d 91, 920-21 (1st Cir. 1980).  Moreover, the court has specifically rejected the argument that a pro se attorney litigant should be awarded fees under the Freedom of Information Act for the time he or she spent on the case.  Aronson, 866 F.2d at 5.  In so concluding, the court reasoned that

> [t]he inference [from such an award] is that the time so spent means the sacrifice of fees he/she would otherwise receive.  But a lay pro se must also devote time to the case.  If such a litigant is a professional person, such as an author, engineer, architect, etc. the time expended may also result in the loss of income.  Lawyers are not the only persons whose stock in trade is time and advice.

Id.  Consequently, the court found no reason to treat pro se attorney-litigants differently from pro se non-attorney-litigants.  Id.  In either event, the court reasoned, the pro se litigant may serve as "a hindrance rather than an aid to the judicial process."  Id.  Awarding Dubois compensation for lost time therefore would provide him with precisely what the First Circuit has determined is unavailable to similar litigants who are not attorneys.

Additionally, the policy behind the EAJA counsels against such an award.  The EAJA's primary purpose was to encourage litigants to retain counsel to "challenge unreasonable governmental action and vindicate their rights in court" by removing

-20-

"the obstacle of litigation expenses." <u>Crooker v. EPA</u>, 763 F.2d at 17. Allowing pro se attorney litigants to recover income lost as a result of time spent litigating a lawsuit would not, however, encourage them to retain counsel. Rather, such recovery would actually provide an incentive to proceed pro se in that such plaintiffs would be assured of recovering at least their regular income, turning pro se litigation into a form of full-salaried sabbatical from regular employment. Consequently, Dubois is not entitled to recover under the EAJA income lost as a result of time spent litigating this case.

## C. **Other Costs and Expenses**

Dubois also seeks to recover: (1) costs in the amount of $1,218.62; (2) expert witness fees in the amount of $2,125.00; and (3) expenses in the amount of $11,627.94.

### 1. <u>Costs</u>.

Dubois seeks $313.25 in costs incurred before this court and $905.37 in costs incurred before the First Circuit Court of Appeals. On October 30, 1997, the First Circuit amended its mandate to include an award to Dubois for costs he incurred on appeal. Pursuant to that amendment, Loon has already paid Dubois $452.43. The government submits that it is in the process of issuing a check covering the remainder of the costs on appeal. Therefore, the EAJA award of costs in Dubois' favor should be reduced by $905.37, for a total award of $313.23.

### 2. <u>Expert Witness Fees</u>.

Dubois seeks to recover expert witness fees in the amount of

$2,125.00 for the work of Dr. Barry Wicklow, who prepared an affidavit in support of Dubois' case. Dr. Wicklow testified by affidavit that he provided his services to Dubois free of charge and that he wishes any fees recovered in this action to be paid to certain enumerated charitable organizations. The EAJA, however, expressly provides reimbursement only for costs and expenses "incurred" by a prevailing party. 28 U.S.C.A. § 2412(d)(1)(A). Consequently, because Dubois never actually incurred any expense in exchange for Dr. Wicklow's services, he may not recover the value of such services under the EAJA. See McLaughlin by McLaughlin v. Boston School Comm., 976 F. Supp. 53, 67 (D. Mass. 1997) ("Where a plaintiff applies for fees for work performed by non-lawyers, any award [under § 1988] for this work is limited to the amount of money actually paid to them.")[8] (citing Lamphere v. Brown Univ., 610 F.2d 46, 48 (1st Cir. 1979)).

 3. Other Expenses.

 The EAJA allows a prevailing party to recover as expenses, inter alia, "the reasonable cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case." 28 U.S.C.A. § 2412(d)(2)(A). Most courts interpret this provision

---

 [8] In McLaughlin, the court employed this reasoning in a somewhat different setting, denying recovery of costs to law students who had worked on the plaintiff's case without pay. 976 F. Supp. at 67. This reasoning, however, applies with equal force to pro bono services provided by experts. In either event, the plaintiff incurs no cost for which compensation is due.

-22-

as including costs and expenses that an attorney would normally pass along to his or her client. See, e.g., Jean v. Nelson, 863 F.2d 759, 777 (11th Cir. 1988), aff'd, 496 U.S. 154 (1990); Kelly v. Bowen, 862 F.2d 1333, 1335 (8th Cir. 1988); Oliveira v. United States, 827 F.2d 735, 744 (Fed Cir. 1987); Ashton v. Secretary of Health and Human Servs., 808 F.2d 9, 12 (2d Cir. 1986); International Woodworkers of Am. v. Donovan, 792 F.2d 762, 767 (9th Cir. 1986). Such pass-along costs and expenses include any attorney's travel, telephone, postage, photocopying, and computer research bills. Jean, 863 F.2d at 777; Ashton, 808 F.2d at 12; de Allende v. Shultz, 709 F. Supp. 18, 25 (D. Mass. 1989), rev'd on other grounds, 891 F.2d 7 (1st Cir. 1989). Costs and expenses that would typically be part of a law firm's overhead, however, are not recoverable as expenses under the EAJA but rather are recoverable, if at all, as part of an attorney's hourly fee. Kelly, 862 F.2d at 1335; Taylor Group, Inc. v. Johnson, 919 F. Supp. 1545, 1555 (M.D. Ala. 1996); Kimball v. Shalala, 826 F. Supp. 573, 576-77 (D. Me. 1993).

Several items for which Dubois seeks reimbursement are more akin to items included in firm overheard and, therefore, are not recoverable as "expenses" under the EAJA. These items include miscellaneous travel expenses incident to research, such as mileage to and from various libraries, parking fees, subway tokens, and taxi fares, and routine office supplies, such as paper, folders, and computer-printer ink cartridges. A substantial portion of the items for which Dubois seeks reim-

bursement, however, are of the type that a law firm would typically bill directly to its client.  These items include bills for postage, express mail, telephone calls, facsimiles, photo-copies, travel incident to court appearances, and computer research.

There are two significant limitations on the amount Dubois may recover for those expenses reimbursable under the EAJA. First, the EAJA expressly limits recovery to expenses "found by the court to be reasonably necessary to the party's case."  28 U.S.C.A. § 2412(d)(2)(A).  "[E]xpenses . . . that are not incurred or expended solely or exclusively in connection with the case before the court, or which the court finds to be unreasonable or unnecessary in the pending litigation, cannot be awarded under the EAJA."  Jean, 863 F.2d at 778 (quoting Oliveira, 827 F.2d at 744).  Included among Dubois' twenty-six-page list of expenses are several items that appear to be wholly unnecessary to this case.  For instance, Dubois seeks reimbursement for long-distance telephone calls made to a person at "CLF", presumably the Conservation Law Foundation, a party playing no necessary role in Dubois' case.  Additionally, Dubois seeks reimbursement for telephone calls made to third-party attorneys to explore the possibility of them working on this case.  Finally, I note that contemporaneous with several of the items of his list of expenses, Dubois was engaged in a related but distinct case challenging the construction of a snow-making pipeline at Loon's ski area.  Certainly, expenses incurred as a

result of this separate litigation are not recoverable in this EAJA action.

Second, a district court confronted with an EAJA application must "consider the relationship between the amount of the fees [and expenses] awarded and the results obtained" by the prevailing party. See Jean v. United States, 496 U.S. 154, 163 n.10 (1990) (citing Hensley v. Eckerhart, 461 U.S. 424, 437 (1983)). In Jean, the Supreme Court found that a prevailing party may recover not only fees and expenses incurred in the substantive litigation, but also those incurred in pursuing relief under the EAJA. Id. The Court also noted, however, that "fees [and expenses] for fee litigation should be excluded to the extent that the applicant ultimately fails to prevail in such litigation." Id.; Anthony v. Sullivan, 982 F.2d 586, 590 (D.C. Cir. 1993).

In this case, Dubois sought to recover not only costs and expenses under the EAJA, but he also sought attorney's fees as a sanction against the government's allegedly bad faith and vexatious conduct. He included the costs and expenses he incurred in pressing his claim for sanctions in his bill of costs submitted under the EAJA. For reasons discussed above, I deny Dubois' request for bad faith sanctions. Consequently, Dubois cannot recover under the EAJA expenses incurred unsuccessfully pursuing his bad faith sanction claim. See Jean, 496 U.S. at 163 n.10 ("For example, if the Government's challenge to a requested rate for paralegal time resulted in the court's recalculating and

reducing the reward for paralegal time by the requested amount, then the applicant should not receive fees for the time spent defending the higher rate."); <u>Anthony</u>, 982 F.2d at 590.

Based on the current record, I am unable to determine with any degree of accuracy the amount of the EAJA award to which Dubois is entitled. Rather than simply guessing at the proper amount, I grant Dubois leave to recalculate his bill of costs and expenses in a manner consistent with this opinion. In recalculating his costs, he shall omit the following items: (a) attorney's fees; (b) reimbursement for lost income; (c) $905.37 in appellate costs that the government and Loon have paid or are in the process of paying to him; (d) $2,125.00 in expert fees; (e) miscellaneous travel expenses as described above; (f) expenses for routine office supplies, including but not limited to such items as paper, printer ink, and folders; (g) any expenses not reasonably necessary to this case, including but not limited to the items listed above; and (h) any costs or expenses incurred pursing bad faith sanctions against the government.

## VI. <u>CONCLUSION</u>

For the foregoing reasons, plaintiff's motion for costs and expenses under the EAJA (document no. 142.1) is granted in part and denied in part. Plaintiff's motion for attorney's fees under the EAJA or as a sanction against the government (document no. 150) is denied in its entirety. Plaintiff is directed to submit a revised bill of costs and expenses, calculated in a manner

consistent with this order, fourteen days from the date of this order.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

July 17, 1998

cc:  Roland Dubois
     Jed Callen, Esq.
     Sylvia Quast, Esq.
     Stephen Herm, Esq.
     David Legge, Esq.
     Scott Hogan, Esq.
     Evan Slavitt, Esq.
     Alexander Kalinski, Esq.
     David Neslin, Esq.